Marc Mauricio MORROW, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–87–00677–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 31, 1988.

Stanley Schneider, Houston, for appellant.

John B. Holmes, Dist. Atty., Harris County, for appellee.

Before SAM BASS, LEVY and STEPHANOW, JJ.

## OPINION

LEVY, Justice.

A jury found the appellant guilty of possession of cocaine with intent to deliver, and assessed punishment at imprisonment for 25 years and a fine of $250,000.

The record reflects that on the morning of April 12, 1987, appellant arrived at Houston Intercontinental Airport on a Delta Airlines flight after taking Eastern Airlines from Miami to Dallas. The appellant went to the Delta baggage office around 8:30 in the morning and reported to Delta employee Fred Ortiz that "his bag did not come in." Appellant was requested to fill out information for a baggage tracer, and he gave Ortiz the name "M. Morrow" but did not give an address or phone number, saying he would be "out of pocket." Appellant then made three phone calls to the Delta baggage office between 10:15 a.m. and 10:45 a.m. inquiring whether the suitcase had arrived, even though the agent then on duty, Tom Gower, told the appellant that the suitcase probably would be arriving around 12:20 p.m. Appellant continued to call Delta throughout the morning and on the fourth or fifth call he told Gower "that he would prefer [they] not open the bag," saying it contained "personal valuables." Gower told appellant that bags were not opened unless they lacked name tags, and appellant then told Gower that his suitcase bore a tag with the name "Steve" and an address on Beverly Hills in Houston. Gower, who had worked for Delta for 26 years, regarded it as being unusual for a customer to make so many phone calls about lost baggage and for luggage to be labeled with the name of someone other than the passenger.

Around 11:30 a.m., appellant's suitcase was found at the American Airlines baggage area, and an American agent brought

the suitcase to the Delta office. Based on the unusual circumstances, Gower remarked to his supervisor Jim Watson, "I don't know if we've got guns, dope, or explosives or something, but something is in the bag that he is concerned about." Between 11:30 a.m. and noon, Watson opened the suitcase, which was not locked. Watson testified that his primary purpose in opening the bag was to identify the bag to the tracer and identify the contents in the bag to facilitate its return to its proper owner. Inside, Watson and Gower saw plastic containers sandwiched between two towels, along with some athletic clothes. Watson then called Officer T.A. Hoffpauer of the airport detail of the Houston Police Department Narcotics Devision.

When Officer Hoffpauer arrived, he called U.S. Customs agent Paul Meaghers, who brought along "Oliver," a trained narcotics detection dog. Oliver went straight to the open suitcase, ignoring the 20 to 50 other bags in the room. He alerted on the bag and even grabbed and held onto one of the plastic packages, which then had to be removed from his mouth by Officer Meaghers. The suitcase was thereafter closed.

Later, appellant once more called Gower and was told that the bag had been found. About an hour later appellant appeared at the Delta baggage office and claimed the bag. He left with the suitcase but was stopped soon thereafter by the police officers who detained him and, after obtaining his consent, searched his bag. Following the search, appellant was arrested. The plastic containers from the suitcase were found to contain 3,013 grams of 73 percent pure cocaine, which is more than 100 ounces, or over six and a half pounds.

Appellant's first and 13th points of error will be considered together.

In his first point of error, appellant contends that the evidence was insufficient to support the jury's verdict that appellant possessed a controlled substance with intent to deliver because the State presented no evidence of appellant's intent to deliver a controlled substance.

Where a sufficiency of the evidence point is raised, the appellate court views the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the elements of the offense beyond a reasonable doubt. This is true whether the State's proof is by direct or circumstantial evidence. Where a reasonable hypothesis other than the guilt of the defendant remains after such review, proof of guilt is not established to the necessary degree. Intent may be proved by circumstantial evidence.

*Pitts v. State,* 731 S.W.2d 687, 691 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd) (cites omitted).

In his 13th point of error, appellant urges that the trial court erred in overruling his objection to Houston Police Officer Henry Lewis's testimony concerning the use of cocaine and narcotic dealing generally as being irrelevant.

The record reflects that appellant had approximately 3,013 grams, or about 6.6 pounds, of cocaine in his possession at the time of his arrest.

Houston Police Officer Henry Lewis testified as an expert witness that cocaine typically is consumed by its users in small doses. Lewis said a user of cocaine typically buys one or two grams of it at a time, with the minimum price being around $75. Lewis demonstrated what a gram of powder is by displaying a one-gram packet of "Sweet 'N Lo" and explained that a cocaine user could get one to five "rails" of cocaine out of a gram. A rail is inhaled, using a straw. In the alternative, Lewis explained, cocaine can be processed into a solid "rock" which can be smoked. This form of cocaine, also called "crack," is commonly sold in "rocks" weighing a quarter of a gram, and costing about $25. Lewis opined that it would be impossible for a person to have 3,013 grams of cocaine, or even 400 grams, for individual use; it would take "years" to use it up, and the human body could not "take that kind of abuse."

Evidence of a large quantity of cocaine seized (in the amount of 1,025 grams), coupled with a police officer's expert witness testimony as to the amount of cocaine a

user would normally and customarily possess for personal use, is sufficient to show possession with intent to deliver. *Pitts,* 731 S.W.2d at 692.

In the case at bar, appellant possessed almost three times as much cocaine as the defendant possessed in *Pitts.* The testimony of Officer Lewis was similar to the police officer's testimony in *Pitts* and was highly relevant to show that the quantity possessed by appellant far exceeded any amount he would normally possess for his own personal use.

Points of error one and 13 are overruled.

In points of error two, three, and four, appellant asserts that the trial court erred in failing to suppress the admission of the cocaine into evidence because its seizure stemmed from the illegal search of appellant's suitcase. Appellant urges that the opening and search of his suitcase by Delta Airlines personnel violated his right to privacy under the Fourth Amendment of the United States Constitution and under article I, § 9 of the Texas Constitution, and that the eventually seized evidence was thus inadmissible under Tex.Code Crim.P. Ann. art. 38.23 (Vernon 1979).

■■■■ Generally, the exclusionary rule does not apply to the search and seizure of property by a *private* individual where there is no governmental involvement. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). The courts have uniformly established a two-prong analysis to determine whether a search is "private." First, when a search is conducted by a private individual but at the government's initiation and guidance, it is not a private search. *United States v. Newton,* 510 F.2d 1149 (7th Cir.1975); *Corngold v. United States,* 367 F.2d 1 (9th Cir.1966). Second, when a search is not clearly initiated by the government, it must be judged according to the nature and degree of the governmental participation in the functional, not merely physical, search process. Appellant argues that the Delta Airlines employees involved in the opening and search of his suitcase were actually acting as agents on behalf of the federal government due to the government's estab-

lishment and regulation of security measures to be followed by the airline industry.

In *Chaires v. State,* 480 S.W.2d 196 (Tex. Crim.App.1972), the Court of Criminal Appeals held that an airline agent's detection of the odor of marijuana emanating from luggage, and the airline employee's verification thereof by opening the baggage and thereafter notifying the police, presented the State with probable cause for a warrantless arrest of the owner of the bag and a warrantless seizure of contraband aboard the aircraft. The court noted that Braniff Airlines agents, acting on their own initiative, suspected the presence of marijuana and made a discovery inspection that sustained their initial suspicions, after which they alerted the police. The Court of Criminal Appeals concluded that "the police did not open, induce the opening of, or participate in the opening of the appellant's baggage necessary to bring him within the *Corngold* rule." *Id.* at 198; *see Corngold,* 367 F.2d at 1. The *Chaires* court concluded that the Braniff agents were acting as private parties and were not acting in the role of agents for the police.

Appellant asserts that *Chaires* is of no precedential value in the case at bar because in *Chaires* the record failed to show any affirmative link between law enforcement and the airlines based upon any government regulations. Appellant argues that here he established the affirmative link by showing that the federal government mandates certain security regulations and requirements that all airlines must adhere to. We conclude, however, that appellant failed to show any affirmative link between these regulations and the airline's handling of domestic *inbound* "lost" luggage, the category concerned in the case at bar.

James Watson, a supervisor of Airport Passengers Service for Delta Airlines, testified that while there may be governmental rules and regulations that govern inbound baggage suspected of containing explosives and weapons, he simply did not recall them. He further stated that the F.A.A. guidelines and profiles applied to *outbound* baggage only, that the F.A.A.

has no jurisdiction over what he does, and that he could not recall any F.A.A. regulations concerning domestic baggage. He also testified that there are several local airport and corporate rules on opening inbound baggage, but that he "[did] not believe they [fell] under any federal guidelines." He said that the F.A.A. distributes literature on baggage profiles and guidelines for dealing with weapons and explosives to Delta, but that he did not recall any information on search and seizure. He asserted that he knew of no lectures, information, or literature on drug profiles. He then testified that he was under no instructions from police to open the bag and that he had never received instructions or training by the police or the DEA on when to open a suitcase or contact the police.

During the State's case-in-chief, Watson additionally testified that one of the conditions of the contract for travel between airlines and their passengers is that all bags are subject to inspection.

Watson testified that Delta employee Gower, one of his supervisees, called him, saying that he was concerned about the contents of a bag (appellant's) because Delta employee Ortiz, who had taken the tracer on appellant's missing bag, had not gotten either a local or a permanent residence contact, and Gower could not later obtain that information from the passenger (appellant), who had called numerous times.

Watson further testified that he had considered opening the bag because he was concerned about the suspicious nature of the phone calls and, to some extent, concerned that the contents might be hazardous material,

> "[b]ut probably the main reason that I decided to open the bag was the tracer information was totally incomplete. No contact to contact the passenger. He had called several times. The identification, it did not have minimum identification that should have been on the bag for acceptance.... The main thing was to identify the bag to the tracer and identify the contents in the bag."

In support of his position, appellant cites us to *United States v. Krell,* 388 F.Supp.

1372, 1374 (D.Alaska 1975), in which the federal district court concluded that when the only purpose of a search by an airline employee on airline premises of a box being shipped by air was to turn any drugs located over to the police, such search must be scrutinized within the meaning of Fourth Amendment requirements. In *Krell,* the court concluded that the search and resulting seizure of evidence must be suppressed, relying on the United States Supreme Court's decision in *Coolidge v. New Hampshire,* 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971), wherein the Supreme Court stated that the test to be applied to determine whether a private person is acting as the instrument or agent of the State is whether, in light of all the circumstances, the private citizen *must* be regarded as acting as an instrument or agent of the State. In applying that test, the court concluded that the government may not encourage conduct by private persons that the government itself may not do, and if the government does encourage a search, or if an airline agent searches solely for the purpose of aiding in law enforcement, the search is illegal.

However, *Krell* and *Coolidge* are not applicable to the case at bar because Watson's primary purpose in opening and searching the appellant's bag was to identify the bag to the tracer and facilitate its return to its proper owner. The bag was not opened solely for the purpose of aiding in law enforcement, was the case in *Krell* and *Coolidge.*

Appellant's second, third, and fourth points of error are overruled.

Appellant's points of error five through 11 will be considered together.

In points of error five through seven, appellant urges that the trial court erred in overruling his motion to suppress the cocaine seized from him because it was the fruit of his illegal detention by Houston Police Officers in violation of the Fourth Amendment of the United States Constitution, article I, § 9 of the Texas Constitution, and Tex.Code Crim.P.Ann. art. 38.23. (Vernon 1979).

In points of error eight, nine, and 10, appellant asserts that the trial court erred in overruling his objection to the admissibility of the search of his suitcase because the consent was involuntary, in that it stemmed from his illegal arrest and detention in violation of the Fourth Amendment of the United States Constitution, article I, § 9 of the Texas Constitution, and Tex. Code Crim.P.Ann. art. 38.23.

Appellant urges in his 11th point of error that the trial court erred in overruling his objection to the admission of the contents of the package within the suitcase because the police opened the package without either obtaining appellant's consent to open it or obtaining a search warrant.

The Fourth Amendment to the United States Constitution requires that searches and seizures be grounded upon "objective justification" that governs all seizures of the person, including those seizures that involve only a brief detention falling short of traditional arrest. *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). Article I, § 9 of the Texas Constitution provides that:

> The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

Article 38.23 of the Code of Criminal Procedure similarly provides that:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

■ However, not every encounter between a police officer and a citizen is an "intrusion" requiring the State to provide an objective justification. *Mendenhall*, 446 U.S. at 553, 100 S.Ct. at 1876–1877. There is no constitutional restraint on a policeman addressing questions to anyone on the streets, although in ordinary circumstances the person so addressed has the correlative right to ignore his interrogator and walk away. *Id.* Not every personal transaction between a policeman and an individual, therefore, amounts to "seizure" of the person. It is only when an officer, by means of physical force or by the show of official authority, has in some way restrained the liberty of a person that a "seizure" has occurred. *Id.*

■ It was permissible for Officers Hoffpauer and Fainter to approach the appellant and ask to speak to him. At that point, appellant could have walked away. *Daniels v. State*, 718 S.W.2d 702, 705–06 (Tex.Crim.App.1986). The issue, then, is at what point, if any, appellant was "detained" for purposes of the United States and Texas Constitutions and the laws of Texas. In determining whether a detention by the State has occurred, the test is whether, from the detainee's point of view, there has been such a display of official authority that "a reasonable person would have believed he was not free to leave," thus suggesting the propriety of, or requiring, a peaceful submission to such authority. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *Daniels*, 718 S.W.2d at 706.

■ Officer Hoffpauer testified that after he and Police Sergeant Fainter approached appellant, Hoffpauer asked for and received permission to talk to appellant, and then introduced themselves to him as narcotics officers. He then asked if there was any reason why a narcotics detection dog would alert on the suitcase appellant was carrying. After appellant responded, "No," Hoffpauer asked him for his I.D. Appellant handed him his driver's license, which Hoffpauer examined and then returned. Hoffpauer did not tell appellant that he was free to leave or that he did not have to talk to them, but neither did he inform appellant that he could not leave, nor that he had to talk to the officers.

Officer Hoffpauer testified that three police officers were present when appellant was stopped but that they were not surrounding him, that he and Sergeant Fainter

were beside appellant while the third officer, Officer Slay, was behind him.

The record reflects that Officer Slay was eight to ten feet behind appellant and was not identified to appellant as a police officer prior to the search of the suitcase. There is no evidence that the officers surrounded the appellant, displayed any weapons, ordered appellant to stand still, or moved the appellant more than a few feet from where he was walking when he was first approached. The record reveals no evidence of police threats, coercion, or force.

We hold that no illegal detention occurred.

■ Turning now to the issue of the validity of the search of his suitcase, we observe that one of the specifically established exceptions to the rule requiring both probable cause and a warrant is a search conducted pursuant to consent. *Kolb v. State*, 532 S.W.2d 87, 89 (Tex.Crim.App. 1976). Although the protection guaranteed by the Fourth Amendment may be waived by an individual consenting to a search, before the consent can be effective, the prosecution must prove by clear and convincing evidence that the consent was given freely and voluntarily, *Rumbaugh v. State*, 629 S.W.2d 747, 751 (Tex.Crim.App. 1982), and was not merely a peaceful but involuntary submission to a display of authority.

■ Officer Hoffpauer testified that he had asked appellant for permission to open the bag, to which appellant responded, "Sure, go ahead and look." Hoffpauer testified that he told appellant that he did not have to let them open the bag; that, in fact, he could require the officers to get a search warrant. Hoffpauer testified that appellant responded by saying, "You probably have a warrant anyway." Hoffpauer then testified that he told appellant he did not have a warrant, that "I wanted to be sure he knew I did not have a warrant, that I would—for the bag to be opened by a warrant, that I would have to go before a judge and try to convince the judge to give me a warrant in order to open a bag by warrant." Thus, there is no evidence that

the officers procured appellant's consent to search the suitcase by threats of obtaining a search warrant. Instead, Hoffpauer explained to appellant the prerequisite for obtaining a warrant.

Based on the evidence presented, *which was uncontradicted,* there is no support for appellant's position that the stop amounted to an illegal detention or arrest, nor is there any evidence that the search of the suitcase was not fully and voluntarily consented to by appellant.

■ In appellant's 11th point of error, he argues that the police had neither consent to search the packages nor a warrant for such a search. He urges that because the packages were secured and the police knew his identity, they could have legitimately obtained judicial review of the legality to search the packages. *See United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Stewart v. State*, 611 S.W.2d 434 (Tex.Crim.App.1981). He further asserts that the State must therefore prove by clear and convincing evidence that the defendant consented to the search of the packages. *Evans v. State*, 530 S.W.2d 932 (Tex.Crim.App.1975); *see also Meeks v. State*, 692 S.W.2d 504, 509 (Tex.Crim.App.1985). Consent can be inferred or implied, but it must be unequivocal. *Meeks*, 692 S.W.2d at 509. Appellant avers that no evidence was presented that he consented to the police's opening the packages in his suitcase; that the contested consent to search applied only to the luggage. He urges that the search of the package at the airport, without his consent or before the police obtained a warrant, violated the strict dictates of the Fourth Amendment, article I, § 9 of the Texas Constitution, and Tex.Code Crim.P.Ann. art. 38.23, requiring suppression of the fruits of the search.

The record reflects that the appellant had been asked by Officer Hoffpauer if he was aware of any reason why a narcotics detection dog would alert on the suitcase he was carrying. When Hoffpauer asked for appellant's voluntary permission to open the bag and look in it, appellant re-

sponded, "Go ahead and look in it," even though he was aware that the dog had already alerted on the suitcase. From this response, the appellant's consent to the search of the entire contents of the suitcase could reasonably be inferred.

■ However, even absent appellant's consent to the search of the packages, Oliver's positive alert to the presence of narcotics in the packages would have justified the arrest of appellant and a search of the suitcase and the package it contained, based on probable cause. *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983).

■ Further, appellant could have no intermittent privacy interest in the contents of the suitcase because the Delta employees had just examined the suitcase and had, on their own volition, invited the police to their office for the express purpose of viewing its contents, the suitcase having remained open. The officers "viewing of what a private party had freely made available for [their] inspection did not violate the Fourth Amendment." *United States v. Jacobsen*, 466 U.S. 109, 119, 104 S.Ct. 1652, 1659–1660, 80 L.Ed.2d 85 (1984). "In sum, the [police officers] did not infringe any constitutionally protected privacy interest that had not already been frustrated as the result of private conduct. To the extent that a protected possessory interest was infringed, the infringement was *de minimis* and constitutionally reasonable." *Id.* at 126, 104 S.Ct. at 1663.

We conclude that the trial court did not err in overruling appellant's objection to the admission of the contents of the packages found within the suitcase.

Points of error five through 11 are overruled.

■ In his twelfth point of error, appellant avers that the trial court erred in denying his request to question Jackson Smith, director of security, Southern Region of the United States for the F.A.A., concerning F.A.A. guidelines and regulations during the pretrial hearing contesting the validity of the search of his suitcase. During the proffer of the appellant's case,

the trial court refused to allow him to question Smith regarding F.A.A. guidelines and regulations. The trial court further refused to allow appellant to make a record concerning what questions he would ask and ruled that the testimony was irrelevant to aid the proceedings in this cause. Appellant filed the written proffer of testimony as to the questions that he would ask, and the expected answers of Jackson Smith, which are now before us for our review, as follows:

If allowed to testify concerning F.A.A. guidelines and training required of airline personnel to implement those guidelines, Jackson Smith would have testified to the following:

1) employees are trained concerning what characteristics, actions, and behavior are considered suspicious;

2) anything of a suspicious nature requires certain procedures and steps be taken for the safety of the airline personnel and passengers, including x-ray detection and contact with a supervisor and/or law enforcement;

3) if no suspicion exists that the person or luggage is carrying, or contains, weapons, bombs, etc., then F.A.A. guidelines pursuant to the Security Act of 1974 do not apply; and

4) characteristics which trigger suspicion are not specific for those who would carry weapons, bombs, etc., and their luggage, but are general for anything of a suspicious nature including drugs.

If allowed to testify, Jackson Smith would have testified to the following:

1) the scope of F.A.A. guidelines and regulations after enactment of the Security Act of 1974;

2) the nature of the training materials distributed to the airlines to ensure compliance with the Act and F.A.A. regulations;

3) characteristics of passengers and luggage which trigger suspicion;

4) procedures to be taken in the event suspicion is aroused;

5) action taken by F.A.A. when airlines and airline personnel do not follow proper procedures.

Appellant hoped to establish, through his questioning of Smith, that an airline employee is an agent of the federal government for all purposes of the Fourth Amendment exclusionary rule because of the relationship between the employee and the F.A.A., the agency's rules, regulations, and guidelines. Through Smith, appellant was attempting to establish the general relationship between the federal government (via the F.A.A.), the airlines, and airline employees.

Appellant asks this Court to determine whether the questions proferred were "relevant" pursuant to Tex.R.Crim.Evid. 401,[1] and whether the determination by the trial court of the validity of the search would have been affected by the additional testimony of Smith.

All of Smith's testimony at the pretrial hearing dealt with F.A.A. rules, regulations, and guidelines, pertaining only to the security measures applied to *outbound* passengers and luggage in relation to weapons, explosives, and guarding against terrorists.

Smith testified that any rule an airline adopted concerning the handling of *incoming* luggage, once it was placed in the baggage claim area, would be of the airline's making and would not be a rule required by the F.A.A., but rather would be unconnected with any F.A.A. rules and requirements. Further, he confirmed on cross-examination that the F.A.A. regulations end once the baggage or passengers are off the planes and out of the "sterile" areas (areas where all occupants and baggage have been subjected to inspection for security measures, such as being screened through a metal detector or an x-ray device). Thus, in the case at bar, after the appellant's suitcase was off the plane, the F.A.A. rules no longer applied to it.

In light of Smith's testimony, we are unable to see that the proffered questions have any relevance to the case at bar, which involves *inbound,* unloaded luggage found in the public baggage claim area.

By Smith's uncontradicted testimony, the F.A.A. rules would have no application to such baggage. We also conclude that the trial court's determination of the validity of the search would not have been affected by the additional testimony of Smith.

Appellant's twelfth point of error is overruled.

In his 14th point of error, appellant urges that the trial court erred in overruling his objection to the prosecutor's argument regarding "unqualified" veniremen's opinions expressed during voir dire concerning their impression of the offense of possession with intent to deliver.

A review of the record reveals that, contrary to the appellant's contention, the trial court in fact promptly sustained the appellant's objection to the complained of argument and issued a curative instruction to the veniremen to disregard the prosecutor's remarks.

Appellant's 14th point of error is without support in the record and accordingly is overruled.

In his 15th, 17th, and 18th points of error, appellant complains of the following jury arguments:

1) I ask you to go back. I ask you to use your common sense, to look at the evidence that was given you, to read the charge. Look at the law, just use your common sense. What you are faced with is a drug dealer, and a big, big, big, drug dealer.

2) You can call it whatever you want to call it, but this is not a small time bust. This is not a small time circumstance. This is a dangerous situation with a dangerous drug with an impact on thousands—

3) Which could have—and we all know cocaine does have an impact on people, on families, on friends.

A review of the record reflects that appellant's objection to each of these prosecutorial arguments was sustained. In each instance, the trial court also issued to the

---

**1.** Rule 401 provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

jury appellant's requested curative instruction to disregard. Generally speaking, even if the prosecuting attorney's jury argument has been found to be improper, instruction by the trial judge to the jury to disregard the improper argument is usually sufficient to cure the error. *Anderson v. State*, 633 S.W.2d 851, 855 (Tex.Crim.App. 1982). Whether an argument is harmful enough to warrant reversal is ultimately determined on the basis of the argument's probable effect on the minds of the jury. *Blansett v. State*, 556 S.W.2d 322, 328 (Tex.Crim.App.1977).

The prosecutor's arguments (even assuming they were improper) were certainly not so inflammatory as to have been incurable by the trial court's instruction to disregard.

Appellant's 15th, 17th, and 18th points of error are overruled.

Appellant urges in his 19th point of error that the aggregate harm of the arguments objected to in points of error 15, 17, and 18, is sufficient to amount to reversible error, and that the prosecutor's conduct was so manifestly improper that it resulted in a denial of his right to a fair trial.

We hold that the appellant was not denied a fair trial because any error in the State's arguments was so mild as to have been completely cured by the trial court's instructions to disregard.

Appellant's 19th point of error is overruled.

In points of error 16, 22, 23, and 24, appellant complains that the trial court erred in overruling his objection to the following arguments by the State:

1) What you have here is a man who intends to possess with the intent or possess with the intent to deliver, and you can call that whatever you want to call it.

2) I'll ask each and everyone of you to take a candid poll of your own self, maybe of each other and ask yourself, when is the last time you talked about the fact that drugs are killing this society? Figuratively and literally killing this society. When is the last time each of

you talked about the fact that drugs are available to children, adults—

3) And it's sad, but I tell you what, your tears should be for the three thousand people that might have been lining up for that cocaine. What if it were cut in half? The six thousand people who might have been lining up for that cocaine. How long a line would that be? How many times would that line circle around this courthouse, each one waiting for a gram of cocaine? They have parents. They have children. And your tears should be for them.

■ Generally, there are four proper areas of prosecutorial jury argument: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to argument of opposing counsel; and (4) pleas for law enforcement. *Todd v. State*, 598 S.W.2d 286, 296–297 (Tex.Crim.App. 1980).

■ The first complained of argument easily qualifies as both a summation of the evidence and a reasonable deduction from the evidence. The second complained of argument amounts to nothing more than a dramatic but permissible plea for law enforcement. The third complained of argument is both a reasonable deduction from the evidence and a plea for law enforcement.

Points of error 16, 22, 23, and 24 are overruled.

■ In points of error 20 and 21, appellant complains of the following final argument by the State during the punishment stage:

1) Who should your compassion be for? Well, my job is to represent the citizens of Harris County, and I'd suggest to you as a citizen of Harris County, that that's who your compassion should be for.

2) You look, you work, you live, and you read in the newspapers every single day, about the citizens of Harris County. I'm asking you and I'm telling you that that's who your responsibility is to today.

Again, a review of the record reflects that appellant's objections to these arguments were sustained and that the trial

court then, upon appellant's request, admonished the jury to disregard both of the complained of arguments. The trial court's curative admonitions were sufficient to cure any harm in the State's argument.

Points of error 20 and 21 are overruled.

▇ In point of error 25, appellant complains that the court erred in overruling his request for a mistrial after sustaining his objection and admonishing the jury to disregard the following argument made by the State at the punishment stage:

Why do they go undercover? They go undercover because of cocaine. They go under because of drugs. They go undercover every single day. I tell you what. If you give this man—and if you are considering the minimum, considering 15 or 25, I tell you what, I think you have some explaining to do to H.P.D. [Houston Police Department].

That the trial court's curative instruction to disregard the State's argument was sufficient to cure any harm is evidenced by the jury's assessment of punishment at a term of 25 years, despite the suggestion that such a verdict could call for some "explaining." It is apparent that the jury either followed the curative instruction scrupulously or was not inflamed in the first instance.

Point of error 25 is overruled.

▇ Appellant contends in his 26th point of error that the trial court should have submitted his three requested instructions pursuant to Tex.Code Crim.P.Ann. art. 38.23 (Vernon 1979), which requires a jury instruction on illegal police procedures when there is a factual issue to resolve that could affect the admissibility of evidence, the jury being the trial factfinder. In this cause the appellant requested three instructions, but those were properly denied because there were no factual issues to resolve.

First, the appellant claims he should have been allowed a charge with regard to the "the opening of the suitcase by James Watson," specifically "concerning whether or not James Watson was an agent of the Federal Government based upon his employment with Delta Airlines and the FAA requirements and regulations of Delta Airlines." The trial judge said he had heard "no evidence controversial or disputed that would raise that fact issue for the jury," and accordingly denied the requested charge. Defense counsel did not take issue with that statement or point out trial evidence that the judge may have overlooked. For reasons discussed in the reply to point of error two, there is no rational basis for characterizing Watson's role in this cause as that of an "agent of the Federal Government."

Second, the appellant contends that he should have been given a charge concerning the detention of the appellant and the voluntariness of his consent. Again the court observed that there "were no controverted or disputed fact issues upon which the jury could arrive on [sic] a decision," and denied the request. The appellant again did not point out any particular testimony that the court may have overlooked. As we have previously determined, both the detention and the search were legal.

Third, the appellant requested an issue as to "whether or not the police had the consent of Marc Morrow to open the packages in controversy." The trial judge replied, "They did," and that there was no factual issue for the jury, then denied the requested instruction. Again the appellant did not direct the trial court's attention to any trial evidence that would raise a factual issue. As we have previously established, appellant's consent to the search of the suitcase extended by necessary implication to the packages it contained.

We conclude that the court did not err in refusing to submit to the jury appellant's three requested instructions pursuant to art. 38.23.

Point of error 26 is overruled.

The judgment of the trial court is affirmed.