**Francisco Javier PEREZ, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 01–90–00425–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 10, 1991.

Rehearing Denied Nov. 7, 1991.

Roy Beene, Houston, for appellant.

John B. Holmes, Jr., Harris Co. Dist. Atty., Lester Blizzard, Susan Brown, Asst. Harris Co. Dist. Attys., for appellee.

Before MIRABAL, DUGGAN and O'CONNOR, JJ.

## OPINION

MIRABAL, Justice.

After the trial court overruled a motion to suppress evidence, appellant, Francisco Perez, entered a plea of guilty to the charge of possession of marihuana in a usable quantity of more than five pounds and less than 50 pounds. The trial court found appellant guilty and assessed punishment, in accordance with a plea bargain agreement, at five years confinement, probated, and a $2000 fine. We affirm.

The issue before this Court is whether the trial court abused its discretion in denying appellant's motion to suppress based on what appellant contends was an illegal arrest that tainted his consent to search the automobile where marihuana was found.

On February 17, 1989, Houston Police Officer M.L. Gant was assigned to the Narcotics Division, Airport Detail. Gant testified he received a telephone call around 4:00 p.m. from a Drug Enforcement Agency agent named Sosa, who was stationed at the airport in Atlanta. Sosa informed Gant a male suspect came to the counter and purchased one-way tickets to Houston for himself and a female. The suspect paid for the tickets in cash and was acting very nervous; he acted like he didn't know what name to give the ticket agent when she was issuing the tickets. Sosa thought it was possible the male suspect might be involved in a narcotics transaction, and she gave Gant a full description of him.

Gant and a fellow officer, Bernias, observed the two suspects leaving the plane with two other males in Houston. The suspects appeared to be nervous and were glancing back over their shoulders as they walked down the concourse. When they reached the main lobby, they met appellant. The suspects and appellant shook hands, began talking, and walked toward the luggage area. After bypassing the luggage area, they proceeded toward the exit for private and passenger cars, which is at a different end of the terminal than the exit for taxis.

The officers, who were not in uniform, walked up and identified themselves as police officers to appellant and his companions. The female continued walking toward the exit, where Gant caught up with her and asked her to come back into the terminal. After she returned to the group, she stated that she was not flying with the others. The officer then asked for her ticket, and she pointed to one of the male suspects to indicate that he had the ticket. She acted scared. The police asked the group if they would mind talking with the officers. The suspects agreed to the questioning.

Bernias spoke with appellant, while Gant spoke with the others about two to four feet away. Bernias asked appellant whether he knew the other men in the group, and appellant said no. When Bernias asked why appellant had approached the other people and had shaken their hands, his answer was that he was a friendly type and was just talking to them. Appellant said he had come to the airport to pick up his girlfriend, and that he had arrived in a taxi. Bernias asked appellant if he would stick around while Bernias asked the other folks some questions. According to appellant's testimony, he stayed, but he believed he could have walked out if he had wanted to.

While Bernias was talking to appellant, Gant was talking to the other people. He told the group he had information from Atlanta, he asked if the suspects were transporting narcotics, and he asked if he could look through the female suspect's purse. The female became irate and dumped the contents of her purse out on the floor. The purse contained several small pieces of marihuana and a bag with $5,000 in cash. The female suspect was acting angry and was crying.

Bernias then assisted Gant in interviewing Mr. Lipsey, one of the other suspects. $25,000 in cash was found in Mr. Lipsey's jacket.

The officers then asked the suspects and appellant to move to a more private place, and they all walked to the customs area. Access to this area is by coded card, and the enclosure is not open to the public. Someone on the inside opened the door when the officers knocked. Once in the customs area, Gant asked one of the male suspects if he would mind if the police searched his bag. The police found another $5,000.

While in the customs area, appellant was questioned repeatedly by Officer Bernias about how he came to the airport. Appellant reiterated that he used a taxi. Officer Bernias then asked appellant if he had car keys. Appellant stated he had car keys, but that his car was at home. After the officer asked appellant again about the location of his car, appellant said his car was outside in the parking lot. Bernias then asked appellant if he would show the officer his car, and appellant agreed. The officer walked outside, following appellant, and requested permission to look in the car and search the trunk. Bernias said he advised appellant at least three times that he had the right to refuse to allow the search. After appellant consented, Bernias found a duffel bag in the trunk that contained marihuana. Bernias then handcuffed appellant and read him his *Miranda*[1] warnings.

Appellant testified he did not consent to the search of his automobile, and he repeatedly asked to call a lawyer. The officers said appellant did not ask to call a lawyer.

In four points of error, appellant contends the trial court erred in denying his motion to suppress the fruits of his illegal arrest and questioning, including the search of his automobile, because: (1) the police conduct in stopping him constituted an illegal arrest; (2) his detention was for an unreasonable period of time without reasonable cause for suspicion that he had committed a crime; (3) the police conduct in taking him to the nonpublic customs clear-

ance area constituted an illegal arrest; and (4) the search of his automobile and the seizure of the marihuana were not conducted pursuant to a valid consent by appellant, but were the result of coercion by police officers.[2]

■■■ The trial court is the sole judge of the credibility of the witnesses in a pretrial hearing and, absent a showing of an abuse of discretion, the trial court's findings will not be disturbed. *Freeman v. State*, 723 S.W.2d 727, 729 (Tex.Crim.App.1986); *Walker v. State*, 588 S.W.2d 920, 924 (Tex. Crim.App. [Panel Op.] 1980). On appellate review, the evidence adduced at the suppression hearing is viewed in the light most favorable to the trial court's ruling. *Daniels v. State*, 718 S.W.2d 702, 704 (Tex. Crim.App.1986); *Walker*, 588 S.W.2d at 924.

Applying the appropriate standard of review, we conclude the trial court could have reasonably concluded from the evidence:

1. The initial encounter between appellant and the police in the open lobby area by the exit door did not constitute a detention or a stop.

2. When the officers, appellant, and the other suspects moved to the customs area, appellant was "seized" or "detained" at that point, for investigatory purposes, but appellant was not under arrest.

3. The lawful investigatory detention was temporary and lasted no longer than necessary to effectuate the purpose of the stop, and therefore the detention did not constitute an arrest requiring probable cause.

4. Appellant voluntarily consented to the search of his car, and the consent was not tainted by any illegal detention.

Therefore, we find the trial court did not abuse its discretion in denying appellant's motion to suppress the evidence found as a result of the search of his car.

---

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** Appellant does not indicate whether he is asserting rights under the Texas Constitution or the U.S. Constitution. We note appellant's brief does not mention Art. I, § 9 of the Texas Constitution.

■ No *stop* or *detention* occurs, for fourth amendment purposes, if a police officer merely approaches a person in a public place and asks questions, as long as the person is free to walk away. *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983); *Holladay v. State*, 805 S.W.2d 464, 471 (Tex.Crim. App.1991); *Daniels v. State*, 718 S.W.2d 702, 704–706 (Tex.Crim.App.1986). The fact that the officer identifies himself as a police officer during the questioning, without more, does not convert the encounter into a seizure requiring some level of objective justification, *Royer*, 460 U.S. at 497–98, 103 S.Ct. at 1323–24; *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (5–4 decision).

■ In the present case, when appellant and his three companions were near the private car exit of a crowded Intercontinental Airport, the police officers, in plain clothes, came up to them, identified themselves as police officers, and asked if they would mind talking. Appellant and the others said they didn't mind talking. Officer Bernias testified that, if appellant and his companions had said they didn't want to talk to the officers, the officers would have just let them go. Officer Gant testified appellant and his friends were told they could leave. Appellant testified and acknowledged that, even after the female suspect had dumped out her purse on the floor, appellant supposed he "still could have walked out the door."

It is relevant that one police officer spoke with appellant, while another police officer spoke with the described suspect and his companions, two to four feet away. The officer speaking to appellant did not mention the tip they had from Atlanta, did not say he was conducting an investigation, and did not ask to see appellant's identification. Rather, the officer asked appellant if he knew the other men in the group, and when appellant said "no," the officer asked why appellant had come to the airport, and asked how he had gotten there. That was the sum total of the officer's questions to appellant, other than to ask if appellant would mind staying around while the officer asked the other people some questions. Appellant testified at the suppression hearing that, at that point, he thought he was free to go if he wanted to.

In our opinion, the evidence supports the conclusion that a reasonable person, from appellant's point of view, would have believed he was free to leave. Therefore, the trial court could have reasonably, and properly, concluded there was no *seizure* of appellant at that point in time. *Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877–78; *United States v. Berry*, 670 F.2d 583, 595 (5th Cir.1982); *Daniels*, 718 S.W.2d at 706.

When the female suspect angrily dumped her purse contents on the floor, they were all in front of the exit doors; the female suspect was mad and crying and causing a scene. The officers then asked the appellant and his three companions if they would mind moving away from the doors to another location. There was a lot of pedestrian traffic around the exit doors at the time. Appellant, his companions, and the officers, moved around the corner to the customs clearance area. A customs agent opened the locked door from the inside to let them in. They met in the very large customs inspection room that has numerous counters for travelers to place their baggage on for inspections. The room is "ten times bigger" than the trial court's courtroom, "or maybe even larger." They did not go into the smaller offices; they stood and talked in the large area. At that moment, there were no international passengers deplaning and going through the customs lines.

■ In our opinion, once appellant was in the customs area, it would have been reasonable for him to believe he was being detained and was not free to leave. However, not all seizures of the person must be justified by probable cause to arrest for a crime. *Royer*, 460 U.S. at 497–98, 103 S.Ct. at 1324–24; *Daniels v. State*, 718 S.W.2d at 704. Since a temporary detention represents a lesser intrusion on an individual's security and integrity than a formal arrest, *reasonable suspicion of criminal activity* warrants a temporary seizure for the pur-

pose of questioning limited to the purpose of the stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975). Temporary detention for questioning on less than probable cause is warranted where the public interest involved is the suppression of illegal transactions in drugs or of any other serious crimes. *Florida v. Royer*, 460 U.S. at 497–498, 103 S.Ct. at 1323–24.

The fact the suspects were moved to a private area does not, in itself, taint the detention. "[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area." *Royer*, 460 U.S. at 504–05, 103 S.Ct. at 1328.

To justify an investigative detention, the officer must have a reasonable suspicion, based on specific, articulable facts that, in light of the officer's experience and general knowledge, lead the officer to the reasonable conclusion that criminal activity is underway and that the detained person is connected with the activity. *Holladay*, 805 S.W.2d at 47; *Daniels*, 718 S.W.2d at 705; *Johnson v. State*, 658 S.W.2d 623, 626 (Tex. Crim.App.1983); *Pickens v. State*, 712 S.W.2d 560, 562 (Tex.App.—Houston [1st Dist.] 1986, pet. ref'd). By the time the group moved to the customs area, the officers were aware of the following facts:

\* A DEA agent from Atlanta had called Officer Gant and told him a suspect had purchased two one-way tickets to Houston for himself and a female. He paid cash and was extremely nervous; he acted like he didn't know what name to give the ticket agent when she was issuing the tickets. The Atlanta agent thought it was possible the suspect might be involved in a narcotics transaction, and gave a full description of the suspect.

\* The described suspect and his companions appeared very nervous as they deplaned in Houston; as they walked down the concourse, they looked back several times.

\* Appellant shook hands with the suspects when they got to the main lobby, and they all proceeded downstairs, past the baggage claim area, and toward the exit for private cars, which is at a different end of the terminal than the exit for taxis.

\* When asked, the female suspect told an officer she was not flying with the other suspects, yet when the officer asked to see her ticket, she pointed to one of the male suspects, indicating he had the ticket. She acted scared.

\* An officer said he had information from Atlanta, asked if the suspects were transporting narcotics, and asked if he could look through the female suspect's purse; at that point she became irate and dumped the contents of her purse onto the floor. The purse contained a small bag with $5000 cash, plus several small pieces of marihuana. The female suspect was acting angry and was crying.

\* Another officer was speaking to appellant two to four feet away from the group. He asked appellant if he knew the other men in the group, and appellant said "no." When asked why he had approached the other people and had shaken their hands, his answer was that he was a friendly type and was just talking to them. He said he came to the airport to pick up his girlfriend, and that he had arrived in a taxi. The officer asked appellant if he would stick around while he asked the other people some questions; appellant stayed, although he believed he could have walked out if he wanted to.

\* The same officer who had spoken to appellant then assisted in interviewing Mr. Lipsey, one of the other suspects. $25,000 in cash was found in Mr. Lipsey's jacket.

\* At that point, the officers asked if the group would mind moving to a more private place, and then they all walked to the customs inspection area. The officers suggested moving because it was crowded by the exit door and the female was causing a scene, and the officers were suspicious that the group might be involved in illegal activity because "they were lying about a lot of things," and they were carrying substantial sums of cash.

In our opinion, the evidence, viewed in the light most favorable to the trial court's ruling, was sufficient to support a conclusion by the trial court that the officers had reasonable suspicion, based on specific, articulable facts, that led them to the reasonable conclusion that criminal activity was underway, and that appellant was connected with the activity. Therefore, we believe the trial court could have reasonably concluded an investigative detention in a more private part of the airport was justified.

The next issue is whether the detention exceeded the limited scope permissible for seizures on suspicion short of probable cause.

An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26. The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* at 501, 103 S.Ct. at 1326. If the detention becomes prolonged, it can no longer be considered an investigative stop; but there is no rigid time limitation on the permissible length of an investigative stop. The propriety of the stop's duration is judged by assessing whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions quickly. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

In *Sharpe*, the Court specifically rejected the contention that a 20 minute stop is unreasonable, per se; the length of the detention alone does not transfer an investigative stop into a *de facto* arrest. 470 U.S. at 686, 105 S.Ct. at 1575. If the police act diligently and reasonably, and a suspect's actions contribute to the added delay, a 20–minute detention is not too long in duration to be justified as an investigative stop. *Id.*

█ In the present case, there was conflicting testimony regarding the length of time the parties were detained in the customs area prior to arrest. Officer Bernias testified the conversations in the hallway by the exit door lasted 10 to 15 minutes, and that a total of 20 to 25 minutes elapsed from the time he observed appellant first shake hands with the other suspects, to the time appellant consented to the search of his vehicle. The trial court could reasonably have concluded the investigatory detention in the customs area lasted between five and 15 minutes.

Further, it is relevant that appellant was not taken to a small room where he was questioned alone by two officers, nor was his checked luggage retrieved by police and brought to the room during his questioning, nor did the police hold onto his identification during the questioning, as occurred in *Royer*. In the present case, appellant was in a large room, approximately 10 times the size of a court room, and he was conversing with Officer Bernias while the other three suspects were talking with the other officers. They were all standing within a few feet of each other. Officer Bernias testified as follows:

[By Prosecutor]: Q: When you got to the customs [area], what happened then?

[By Bernias]: A: I interviewed Mr. Perez while Sergeant Feiner and Officer Gant were interviewing the other folks.

Q: What was the purpose in interviewing Mr. Perez?

A: His story was he had arrived in a taxicab and I didn't feel that he had arrived in a taxicab because of the exit he was taking. I asked him several times and each time he said that he had arrived in a taxicab.

I asked him if he had any car keys and his answer was he had car keys in his pocket but his answer was the car is at home.

Q: What happened after that?

A: I asked him again, "Where is your car?"

He told me that his car was located at the parking lot outside.

. . . .

Q: What did you do at that point?

A: I asked him if he would show me his vehicle.

Q: Where did you go for him to show you the vehicle.

A: After he responded in the positive, I walked out with him and I took Officer Johnson who is an airport police officer and we walked outside.

Q: Did he show you where his vehicle was?

A: Yes, Ma'am.

Q: When you got to the vehicle, what happened?

A: He walked out the west side of the building to the parking lot closest to the terminal and Mr. Perez showed me a brown Cadillac that he stated was his car.

Q: What did you do next?

A: I asked Mr. Perez if I could look in the car and search the trunk of it.

Q: Did he agree to that?

A: Yes, ma'am, he did.

Q: Did you give him any warnings or tell him anything?

A: After he answered in the positive to allow me to search, I advised him at least three times before I opened the trunk that he had the right to refuse me.

Q: Did he indicate to you he didn't want you to look in the trunk?

A: No, ma'am. Each time he answered in the positive.

Q: Did he indicate to you he wanted to talk to a lawyer before that?

A: No, ma'am, he did not.

Q: Now, how did you get into the trunk?

A: With his keys. He handed the keys back to me and I used his key to unlock the trunk.

When Officer Bernias opened the trunk, he found a duffel bag that smelled strongly like marihuana. At that point, the officer handcuffed appellant and read him his *Miranda* warnings. The duffel bag contained approximately 50 pounds of marihuana, having a street value of approximately $35,000.

■ In our opinion, the evidence supports the conclusion that appellant volun-tarily consented to the search of the trunk of his car. If a defendant voluntarily consents to a search of his belongings while he is justifiably being detained on reasonable suspicion, the products of the search are admissible against him. *Royer,* 460 U.S. at 503, 103 S.Ct. at 1327.

We hold the trial court did not abuse its discretion when it concluded that the police officers did not exceed the limits of a permissible investigatory detention, and that the fruits of the search were admissible. As stated by the Supreme Court in *Florida v. Royer,* each case must be judged on its own facts.

> We do not suggest that there is a litmus paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment. Nevertheless, we must render judgment.
>
> . . .

*Royer,* 460 U.S. at 511, 103 S.Ct. at 1331.

We overrule appellant's four points of error.

We affirm the judgment.

O'CONNOR, J., dissenting.

O'CONNOR, Justice, dissenting.

I dissent.

Appellant argues that his detention was tantamount to an illegal seizure that tainted his consent to search the trunk of the car. The majority rejects this contention, reasoning that the seizure of appellant was not tantamount to an arrest requiring probable cause. I respectfully note that the majority has incorrectly distinguished between the terms "arrest" and "seizure" and rewritten the Constitutional require-

ment that an individual shall not be seized without probable cause.

This case involves two analyses: reasonable suspicion to investigate and probable cause to seize an individual. To justify an investigative detention, the officer must have a reasonable suspicion, based on specific, articulated facts that, in light of the officer's experience and general knowledge, lead the officer to the reasonable conclusion that criminal activity is underway and that the detained person is connected with the activity. *Johnson v. State,* 658 S.W.2d 623, 626 (Tex.Crim.App.1983); *Pickens v. State,* 712 S.W.2d 560, 562 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd); *see Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). To justify a warrantless seizure, the officer must have probable cause to believe the person has committed or is about to commit an offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Delaporte v. State,* 471 S.W.2d 856, 856–57 (Tex.Crim.App.1971).

Appellant argues both the initial questioning by the officers and the removal to the Customs area were a "seizure." I will assess the legality of the initial stop separately from the legality of the continuing detention.

### The investigatory stop

In point of error one, appellant contends that the officers' original approach cannot be justified under an airport hijacker exception to the constitutional protections afforded citizens. The threshold inquiry is whether the officers had reasonable suspicion to justify the investigatory stop. *See Pickens,* 712 S.W.2d at 562. An officer may stop a suspicious individual briefly, to determine his or her identity, or to maintain the status quo, or to get additional information. *Johnson,* 658 S.W.2d at 626. An officer may not detain an individual based on a hunch. *Id.*

A temporary, investigative detention, which is less of an intrusion than a seizure, may be justified under circumstances that do not justify a seizure of an individual. *Leighton v. State,* 544 S.W.2d 394, 397

(Tex.Crim.App.1976). But, an investigative detention *must* be temporary and last no longer than is necessary to carry out the purpose of the stop. *Lopez v. State,* 663 S.W.2d 587, 589 (Tex.App.—Houston [1st Dist.] 1983, pet. ref'd). The police should use the least intrusive means reasonably available to verify or dispel suspicion in a short period of time. *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26; *Lopez,* 663 S.W.2d at 589. Reasonable suspicion of crime is not enough to justify custodial interrogation, even though the interrogation is investigative. *Dunaway v. New York,* 442 U.S. 200, 211, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979).

### The initial stop

In this case, the officers saw appellant shaking hands and talking with the suspects from Atlanta. The officers then saw appellant leaving the terminal with them. The officers could have reasonably concluded that appellant knew the suspects. These facts justified the officers' conduct in briefly detaining appellant to ask him about his association with the suspects. *Morrow v. State,* 757 S.W.2d 484, 490 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd). I agree with the majority that the initial encounter between appellant and the police in the open lobby area by the exit door did not constitute an unlawful detention.

### The investigative detention = arrest

Where I part company with the majority is in defining when the initial encounter stopped and the inquiry became an investigative detention, and when that became an arrest. The majority holds that removal of appellant to a locked area and repeated questioning of him did not constitute an arrest, but was merely an investigative detention.

An officer seizes a person when the officer, by the show of official authority, in some way restrains that person's liberty. *Morrow,* 757 S.W.2d at 490; Tex.Code Crim. P.Ann. art. 15.22 (Vernon 1977 & Supp. 1991). Whenever an officer restrains the freedom of a person to walk away, he has seized that person. *United States v. Brig-*

*noni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). The test to determine if a seizure has occurred is whether, from the detainee's point of view, there has been such a display of official authority that a reasonable person would have believed he was not free to leave. *Morrow,* 757 S.W.2d at 490; *see United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The standard is objective and is not based on the particular individual's perception at the time of the event. A seizure without probable cause violates the fourth amendment prohibition against unreasonable searches and seizures. U.S. CONST. amend. IV.

Here, I discuss three cases that have examined whether an investigative stop in an airport becomes an illegal seizure when the police ask a defendant to walk to a nearby detention office for additional interrogation: *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); and *United States v. Berry,* 670 F.2d 583 (5th Cir.1982).

In *Mendenhall,* the officers who stopped the defendant wore no uniforms and displayed no weapons. They requested, but did not demand, to see the defendant's identification; they returned the identification; and they asked the defendant to accompany them to the DEA office. The Court articulated certain factors that might indicate a seizure, including the following: the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In a five to four opinion, the Court held the stop was merely an investigative detention; it was not an arrest.

In *Royer,* the officers stopped the defendant at the airport and asked him to identify himself. When the defendant gave a name that was different from that on his ticket, the officers asked him to explain the discrepancy. The defendant told the officers that another person made the reservations for him. Without returning his ticket, the officers told the defendant that they were narcotics investigators and that they suspected him of transporting narcotics. The officers asked the defendant to accompany them to a room adjacent to the concourse. In the room, the officers continued questioning the defendant. The officers then opened one of his suitcases, found marihuana, and arrested him. Fifteen minutes elapsed from the officers' initial stop until the announcement of arrest. *Royer,* 103 S.Ct. at 1325–26. The Supreme Court held the stop was an arrest. *Id.* at 1327. The Court said that if the officers had returned the defendant's ticket and informed him he was free to go, the consensual nature of the investigation might have continued. In the absence of these factors, the defendant's consent to the investigative stop was negated. *Royer,* 460 U.S. at 503–504, 103 S.Ct. at 1327–28.

The *Royer* Court went to great lengths to explain that its opinion was consistent with *Mendenhall.* *Royer,* 103 S.Ct. at 1327 n. 9. The facts the Court utilized to distinguish between the two cases were that in *Royer,* the officers did not return the ticket to the defendant (in *Mendenhall,* the officers gave the ticket back to the defendant); that the officers did not tell the defendant he was free to leave (in *Mendenhall,* they told the defendant she could leave); and that in *Royer,* the officers had the defendant's luggage when they began the interrogation (in *Mendenhall,* the officers did not have her luggage).

In *Berry,* the airport officers saw the defendant leaving a plane and thought he looked familiar. The officer stopped the defendant, asked to see his identification, questioned him about a discrepancy, and then asked him to accompany the officer to the DEA office nearby. *Berry,* 670 F.2d at 588–89. The court noted that the intrusion on the individual was "[t]antamount to an arrest." The court said that requiring an individual to accompany police to an office showed that questioning would be for a prolonged period and would cut the individ-

ual off from the outside world, subjecting the detainee to increased police pressure. *Id.* at 602. The Fifth Circuit concluded that such a detention is only constitutional if accompanied by probable cause. *Id.*

Here are two graphs of the parallel progress of an officer's reasonable suspicion and the officer's permissible intrusion. The progress of the suspicion must precede the progress of the intrusion.

| The progress of the suspicion |
| --- |

More than a ------->      Reasonable ---------->      Probable
mere hunch               suspicion                  cause

| The progress of the intrusion |
| --- |

Initial ---------->      Temporary --------->      Seizure that
stop                    investigative            invokes 4th
                        detention                amendment
                                                 protections

---

In the case now before this Court, appellant said he believed he was under arrest and could not leave the Customs area. He saw a member of the group who attempted to leave the airport brought back by the officers for more questioning. Officer Bernias testified that the Customs area of the airport is closed to the public and is accessible only by card key. Approximately 25 minutes elapsed from the initial stop until the announcement of arrest. He was not told he was free to leave. Appellant also testified the officers did not tell him he could contact an attorney or give him *Miranda* warnings during the time he was in the Customs area. *See Perchitti v. State,* 659 S.W.2d 75, 77 (Tex.App.—Houston [14th Dist.] 1983, no pet.). The giving of *Miranda* warnings is one factor that a court may consider in assessing the voluntariness of consent to search. *See, e.g., United States v. Watson,* 423 U.S. 411, 425, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Appellant's car keys were taken by the officer who questioned him.

The State does not contend that the officers had probable cause to detain appellant. Rather, the State argues that the officers

had reasonable suspicion to remove appellant to the Customs area and question him because of his association with the suspects.[1] The majority denigrates fundamental rights guaranteed under the fourth amendment when it agrees with the State's position.

First, the majority concedes that "once appellant was in the customs area, it would have been reasonable for him to believe he was being detained and was not free to leave." As discussed above in this dissent, such a detention rises to the level of a "seizure" of the individual.

Incredibly, the majority then concludes that the warrantless seizure of appellant needed only to be supported by reasonable suspicion. The reasons given by the majority for this conclusion are the following:

1. The detention was temporary.

2. The detention was warranted because of the public interest in the suppression of illegal transactions in drugs.

3. Appellant was not taken to a small room. He was in a large room, approximately 10 times the size of a courtroom.

---

1. Appellant exhibited no conduct that was different from that of any other citizen. The Texas Court of Criminal Appeals has expressly stated that conduct such as nervousness or lying when asked a question does not constitute grounds for reasonable suspicion. *Daniels v. State,* 718 S.W.2d 702, 705 (Tex.Crim.App.1986).

4. His "checked luggage" was not retrieved by police and brought to the room during his questioning.

5. The police did not hold onto his identification during the questioning.

I fail to find any of these facts relevant or persuasive. The removal of appellant to a non-access, locked area for a period of approximately 25 minutes of intense one-on-one questioning by a police officer was neither "temporary" nor "warranted." A large, locked room is no less formidable than a small, locked room. Appellant had no luggage, as he was not a passenger on the plane. Finally, the record does not address whether the police retained appellant's identification, though the testimony does indicate that the officer kept appellant's car keys once they were produced.

The fourth amendment does not speak of "arrests," but of "seizures" of persons. A warrantless seizure of an individual must be based on probable cause, not reasonable suspicion. *Dunaway*, 442 U.S. at 213–14, 99 S.Ct. at 2257–58. *See Hayes v. Florida*, 470 U.S. 811, 814, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985). The majority imposes a distinction based on semantics that has no Constitutional precedent or basis.

The test for probable cause for a seizure without a warrant, as stated by the Supreme Court of the United States in *Beck*, 379 U.S. at 91, 85 S.Ct. at 225, is:

> Whether at that moment the facts and circumstances within the officer's knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrested person] had committed or was committing an offense.

*Britton v. State*, 578 S.W.2d 685, 689 (Tex. Crim.App.1979).

Once appellant disclaimed any association with the suspects and did not exhibit any other indicia of criminal activity, the officers should have realized that they had no probable cause to detain him. Instead, the officers asked appellant to move to a secluded area of the airport terminal to continue the interrogation. A reasonable person would have assumed he was under arrest at the time he was moved from the lobby to the Customs area of the airport. I believe the seizure of appellant was not supported by probable cause and was, therefore, illegal.

I would sustain points of error two and three.

### The search of the car

In point of error four, appellant argues that the search was illegal under both the United States and Texas Constitutions. The State contends that appellant gave a valid consent to Officer Bernias to search his car and, thus, removed the taint of any illegal detention.

When the State attempts to prove that a person, under an illegal detention, consented to a search, the State must prove, by clear and convincing evidence, that the consent was voluntary. *Juarez v. State*, 758 S.W.2d 772, 775 (Tex.Crim.App.1988); *Rumbaugh v. State*, 629 S.W.2d 747, 751 (Tex.Crim.App.1982). The State must prove more than just a peaceful, involuntary submission to a display of authority. *Morrow*, 757 S.W.2d at 491. To eliminate any taint from an illegal seizure of an individual, the State must offer proof that the consent was both voluntary and that it was not the product of the illegal detention. *Berry*, 670 F.2d at 604.

The Supreme Court of the United States has reasoned that once the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so "attenuated as to dissipate the taint," the evidence is admissible against a defendant who has suffered a violation of his rights. *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

This Court recently considered whether the connection between an illegal arrest and the defendant's consent to search, obtained during his illegal detention, was sufficiently attenuated from the primary taint to permit the items seized to be used at trial. *Martinez v. State*, 792 S.W.2d 525, 529 (Tex.App.—Houston [1st Dist.] 1990, no pet.). The factors we analyzed in the *Martinez* case included:

(1) The giving of the *Miranda* warnings;

(2) The temporal proximity of the arrest and the search;

(3) The presence of intervening circumstances; and

(4) The purpose and flagrancy of the officers' conduct.

*Id.* at 529, *citing Brown v. Illinois*, 422 U.S. 590, 604–605, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975); *Ball v. State*, 724 S.W.2d 780, 783 (Tex.Crim.App.1986).

In the present case, appellant was not given *Miranda* warnings. Though *Miranda* warnings do not cover a defendant's right to refuse to consent to a search, the officers maintain that appellant was told he was free to withhold consent to search both the car and the trunk of the car. In considering the temporal proximity of the arrest and the search, I note that no circumstances intervened between the illegal seizure of appellant and the request for consent to search. Officer Bernias took appellant's keys and followed appellant directly from the Customs area to his car. Finally, though the purpose of the officers' conduct was to investigate the possibility of a narcotics transaction, the appellant's consent to search would probably not have been obtained independently of the continuing illegal detention of appellant. I find that the illegal seizure of appellant is so closely related in time and purpose to the consent to search that the consent cannot be excised from the illegal seizure. Such conduct by the officers was flagrant in light of my conclusion that the officers lacked probable cause for the seizure of appellant.

I cannot conclude that the prosecution proved, by clear and convincing evidence, that the consent by appellant that allowed Bernias to search the trunk of his car was voluntary. Further, when examining the evidence presented at the suppression hearing in light of the factors set forth by this Court in the *Martinez* case, I am unable to state affirmatively that the evidence seized by the officers was obtained by means sufficiently distinguishable from the arrest to purge it of the primary taint of illegality.

I would sustain point of error four, reverse the judgment, and remand the cause to the trial court.