NO. 07-04-0596-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



AUGUST 30, 2006


______________________________



CURTIS DWIGHT THOMAS, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE


_________________________________



FROM THE 64TH DISTRICT COURT OF HALE COUNTY;



NO. A15653-0408; HONORABLE ROBERT W. KINKAID, JR., JUDGE


_______________________________




Before QUINN, C.J., and CAMPBELL AND HANCOCK, JJ.

OPINION


 Curtis Dwight Thomas brings this appeal challenging the sufficiency of the evidence
supporting his conviction for possession of cocaine and jury-assessed punishment,
enhanced by prior convictions, of fifteen years confinement. We affirm.

 In the early morning hours of June 11, 2004, Plainview police officer Brian Morris
responded to reports of a person knocking on doors and asking for help. Officer Morris
drove to Bullock Street in Plainview, where he found appellant sitting on the curb in boxer
shorts and socks. Appellant chose not to engage in conversation with Morris and
"disappeared" into the night. While the police were searching for appellant, officer Joe
Poras retrieved items of clothing lying in Bullock Street and found a wallet containing
appellant's driver's license in a back pocket of the pants. About twenty minutes after the
original encounter a third responding officer, Art McIntee, located appellant in an area the
officers referred to as "the hood." (1) McIntee took appellant into custody and transported him
back to Bullock Street for identification. Morris identified appellant and arrested him for
public intoxication. 

 Appellant identified the clothing found in the street as his and the officers removed
the handcuffs and allowed appellant to get dressed. Only after appellant was fully clothed
did Morris search him "to make sure . . . there is no knives, guns or anything like that on
their person, or anything illegal." This search revealed a plastic bag in the front pocket of
appellant's pants containing what was later determined to be crack cocaine, thus prompting
appellant's prosecution for possession of a controlled substance.

 The State's case in chief included the testimony of the officers named, a videotape
of the events from Morris's patrol car, a chemist who identified the substance found in
appellant's pocket as .39 grams of cocaine, and two officers who had custody of that
evidence. Appellant did not testify. The jury found appellant guilty and, on his plea of true
to two prior convictions, returned a verdict on punishment of fifteen years confinement and
a $5,000 fine. The trial court rendered judgment in conformity with the jury's verdicts.

 Appellant now presents a single issue challenging the legal and factual sufficiency
of the evidence supporting his conviction. His brief correctly states the standards by which
we must review challenges to the legal and factual sufficiency of the evidence and
recitation of those standards here is unnecessary. See Jackson v. Virginia, 443 U.S. 307,
99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Zuniga v. State, 144 S.W.3d 477, 484-85
(Tex.Crim.App. 2004); Clewis v. State, 922 S.W.2d 126 (Tex.Crim.App. 1996) (explicating
standards of review). To prove unlawful possession of a controlled substance, the State
was required to prove the accused (1) exercised actual care, custody, control, or
management over the substance and (2) knew the matter he possessed was contraband. 
Tex. Health & Safety Code Ann. §§ 481.002(38), 481.115 (Vernon 2003); Brown v. State,
911 S.W.2d 744, 747 (Tex.Crim.App. 1995). A defendant's knowledge is typically
established by circumstantial evidence. When reviewing the sufficiency of the evidence
of knowing possession our courts have long looked to the affirmative links shown between
the accused and the contraband. Brown, 911 S.W.2d at 747. This "affirmative links rule,"
based on common-sense notions, is designed to protect an innocent bystander from
conviction based solely on his fortuitous proximity to someone else's contraband. 
Poindexter v. State, 153 S.W.3d 402, 406 (Tex.Crim.App. 2005). 

 Appellant's reliance on cases involving prosecution of motor vehicle passengers for
possession of a controlled substance found in the car is misplaced. In each of those
cases, the defendant was not the owner of the car and the controlled substance was not
in the passenger compartment or otherwise within their reach. Jenkins v. State, 76 S.W.3d
709, 715 (Tex.App.-Corpus Christi 2002, pet. ref'd) (defendant was front seat passenger,
marihuana found in trunk and cocaine found after back seat was removed); Dixon v. State,
918 S.W.2d 678, 680 (Tex.App.-Beaumont 1996, no pet.) (marihuana found sealed in
speaker in trunk); Moreno v. State, 821 S.W.2d 344, 351 (Tex.App.-Waco 1992, pet. ref'd)
(cocaine found in engine compartment of car). Here appellant admitted to being the owner
of the clothing where the controlled substance was found. 

 Appellant acknowledges and attempts to distinguish the more factually similar case
of Moss v. State, 850 S.W.2d 788 (Tex.App.-Houston [14th Dist.] 1993, pet. ref'd). Moss
involved a controlled buy conducted by an informant acting for police. When officers
attempted to arrest Moss, he ran into an apartment, removed his outer clothing and
escaped through a window. Id. at 791. After Moss was found and arrested, police
retrieved the clothing from outside the apartment window. They found crack cocaine in a
pocket of the pants. Id. When the pants were offered to Moss at the jail he took them and
put them on "without complaint." Id. Based in part on testimony of officers that they saw
Moss wearing the clothes found outside the window, the court found the evidence sufficient
to sustain the conviction. Id. at 794. Appellant attempts to distinguish Moss on the basis
that no one saw him wearing the clothes before his encounter with the police. Appellant's
admission the clothing was his provides equal, if not greater, connection to the clothing
than was present in Moss, especially when augmented with the presence of appellant's
driver's license in the pants pocket. 

 Some of the facts of Bucklin v. State, 634 S.W.2d 44 (Tex.App.-Beaumont 1982,
no pet.), are similar to those presented here. In Bucklin officers executing a search warrant
found Bucklin and a woman in the house. On the bed of the master bedroom officers
found a pair of pants containing $1,415 cash in one pocket and Bucklin's driver's license
and methamphetamine in another pocket. Id. 45. Before leaving for the jail, Bucklin asked 
to put on some clothes. He retrieved and put on the pants officers found on the bed. Id.
at 46. The court of appeals rejected Bucklin's sufficiency challenge, citing the presence
of his driver's license in the pants, his selection of those pants to wear to jail, and evidence
he lived at the house. Id. at 47. Here, as in Bucklin, the officers did not see the defendant
wearing the clothing before arresting him. In both cases the defendant's identification was
in the same garment as the contraband.

 Appellant argues the State failed to produce any evidence he was in possession of
the controlled substance before officer Morris gave him the pants found lying in Bullock
Street. We disagree. The conclusion that appellant had worn the clothing earlier in the
evening is supported by his unclothed condition when first encountered by officers, the
nearby location of the pants, his express identification of the pants as his, his putting them
on, and the presence of a wallet in the pocket containing his driver's license. The
circumstantial nature of the evidence does not alter our sufficiency review. Geesa v. State,
820 S.W.2d 154, 158 (Tex.Crim.App. 1991). 

 The State was not required to disprove the possibility someone found appellant's
pants in the street and, unknown to appellant, placed cocaine in the pocket. The State's
burden is to prove each element beyond a reasonable doubt, not to exclude every
conceivable alternative to a defendant's guilt. See Geesa, 820 S.W.2d at 161 (rejecting
outstanding reasonable hypothesis of innocence as standard for reviewing sufficiency of
circumstantial evidence). The presence of appellant's clothing in the street is not
significantly different from the fact in Moss that the clothing was outside the apartment
window while officers located and arrested Moss. 850 S.W.2d at 791. A rational trier of
fact could have found the elements of the offense beyond a reasonable doubt. The
evidence was legally sufficient to support the jury's verdict.

 By his factual insufficiency argument, appellant contends a neutral review shows the
evidence "is so obviously weak and factually insufficient that the verdict is unjust." His brief
elsewhere challenges the sufficiency of evidence supporting the jury's implicit finding that
the cocaine was present in the pants at the time appellant removed them, by characterizing
the area where the clothing was found as a "densely-occupied residential area" and
pointing out there were 30 to 40 people in the general vicinity. But the clothing was found
lying in Bullock Street. The 30 to 40 people officer McIntee saw were on Brazier Street. 
Moreover, the jury saw the videotape made from Morris's patrol car. During the eleven
minutes that expired between Morris's initial approach of appellant and officer Poras's
report he found appellant's identification, Morris drove several streets and alleys looking
for appellant. Not a single pedestrian is shown on the videotape and the only vehicle
Morris passed was another patrol car. Even if we consider the evidence of the presence
of other people on Brazier Street to be contrary to the jury's verdict, it is not so strong as
to preclude appellant's guilt beyond a reasonable doubt. Zuniga, 144 S.W.3d at 485. 
Considering all the evidence in a neutral light, the jury was rationally justified in finding
appellant guilty beyond a reasonable doubt. Id. at 484. The evidence of guilt was factually
sufficient. We overrule appellant's sole issue and affirm the trial court's judgment.


 James T. Campbell

 Justice





Publish.








 
1. The record does not show the distance between these locations but testimony and
appellant's counsel's argument to the jury indicate they were separated by at least two
blocks.



 anything Seibert said\
could be used against her also applied to the details of the inculpatory statement previously\
elicited. In particular, the police did not advise that her prior statement could not be used. \
Nothing was said or done to dispel the oddity of warning about legal rights to silence and\
counsel right after the police had led her through a systematic interrogation. . . . The\
impression that the further questioning was a mere continuation of the earlier questions and\
responses fostered by references back to the confession already given. It would have been\
reasonable to regard the two sessions as parts of a continuum, in which it would have been\
unnatural to refuse to repeat at the second stage what had been said before.
\
\
Seibert, 541 U.S. at 616-17. \
'

var WPFootnote16 = '
Although we generally only consider evidence adduced at the suppression hearing because the trial\
court’s ruling is based on what is heard at the hearing rather than on evidence introduced at trial, here the trial\
court sua sponte decided to re-visit its prior rulings in light of Trooper Henderson’s changed testimony and\
the contents of the videotape while the parties subsequently re-litigated the evidence and the issues. See\
White v. State, 201 S.W.3d 233, 239-240 (Tex.App.–Fort Worth 2006, pet. ref’d).
\
'

var WPFootnote17 = '
See Morrow v. State, 757 S.W.2d 484, 488 (Tex.App.–Houston [1st Dist.] 1988, pet. ref’d), cert.\
denied, 493 U.S. 921, 110 S.Ct. 285, 107 L.Ed.2d 265 (1989) (3,013 grams of cocaine); Pitts v. State, 731\
S.W.2d 687, 692 (Tex.App.-Houston [1st Dist.] 1987, pet. ref’d) (1,025 grams of cocaine); Hurtado v. State,\
722 S.W.2d 184, 189 (Tex.App.–Houston [14th Dist.] 1986, no pet.) (over 1,000 grams of cocaine); Vasquez\
v. State, 699 S.W.2d 294, 296 (Tex.App.–Houston [14th Dist.] 1985, no pet.) (over twenty-three thousand\
capules of mandrax). \
'

var WPFootnote18 = '
The State’s only other witness was Brandon Conrad, the State’s chemist who testified the substance\
found in the car was 491.64 grams of cocaine. \
'

var WPFootnote19 = '
At trial, the State’s case against Appellant for “intent to deliver” hinged almost entirely on Appellant’s\
incriminating statements. While a large amount of drugs such as 1,000 grams of cocaine or 23,000 narcotic\
pills, coupled with expert testimony, can show intent to deliver, such amounts are not involved here. In this\
case, we have 491 grams of cocaine found in a vehicle with a driver and a passenger. Further, there is no\
evidence that Appellant: possessed an excessive amount of cash much less any cash at all; the cocaine was\
packaged in a manner indicating intent to sell; Appellant possessed any baggies, scales, or other items used\
in sales or transactions involving drugs; Appellant was arrested in an area known for drug sales; Appellant\
had any weapons in the car; or that Appellant attempted to flee.
\
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}







NO. 07-07-0157-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D 

APRIL 1, 2009

______________________________


CARL ALLEN CARTER, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_________________________________

FROM THE 31ST DISTRICT COURT OF WHEELER COUNTY; 

NO. 4063; HONORABLE STEVEN R. EMMERT, JUDGE

_______________________________


Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ. 


OPINION


          Appellant, Carl Allen Carter, was convicted by a jury of possession of a controlled
substance with intent to deliver in violation of section 481.112 of the Texas Health and
Safety Code. He was sentenced to twenty-five years confinement and fined $25,000. 
Appellant contends the trial court erred when it: (1) denied his motion to dismiss the
indictment due to racial profiling; (2) denied his motion to suppress evidence derived from
an illegal arrest prompted by racial profiling; (3) denied his motion to suppress evidence
derived from an illegal search prompted by racial profiling; (4) denied his request to present
at trial a videotape of the arresting officer’s entire shift as evidence of racial profiling; (5)
denied his motion to suppress statements made after his arrest but prior to being read his
Miranda warnings; (6) denied his motion for mistrial because statements made by him after
being Mirandized were “fruit of the poisonous tree”; and (7) the evidence in support of the
verdict is factually insufficient. We reverse the judgment of the trial court and remand for
further proceedings in conformance with this opinion. 
Background
          On October 9, 2003, a Wheeler County Grand Jury returned an indictment charging
Appellant with possession of 400 grams, or more, of cocaine with intent to deliver. On
January 1, 2004, Appellant filed three motions to suppress evidence alleging that his car
was illegally searched, his arrest was without probable cause, his admission/confession
was taken when he was without counsel, and he had not intelligently and knowingly waived
his rights.
          I.        Pre-trial Suppression Hearing 
          Jason Henderson, a trooper for the Texas Department of Public Safety, was the
sole witness at the hearing. He testified that, on March 31, 2003, he was patrolling
Interstate 40 when he observed a silver Pontiac traveling eastbound in the left hand lane
next to the median. Trooper Henderson was traveling westbound on the opposite side of
the median. As the two vehicles passed, Trooper Henderson made eye contact with the
driver who then crossed over to the right lane and exited I-40 without a signal. Having
observed two traffic violations, Trooper Henderson immediately cut across the median and
activated his overhead lights. 
          Trooper Henderson next observed the driver run a stop sign as he made a left hand
turn on Farm-to-Market Road 1443. Approximately one-half mile down the road, the driver
pulled over onto the shoulder. Trooper Henderson called the Shamrock Police Department
for assistance and pulled behind the vehicle. He approached and asked the driver, Craig
Willis, for his license and registration. Willis did not have a driver’s license. Appellant, a
passenger, produced a rental contract showing he had leased the vehicle. 
          Trooper Henderson first spoke with Willis who told him they were coming from
Tucson, Arizona, where his little brother played basketball. Subsequently, Appellant
indicated they were coming from Phoenix, Arizona, where they had stayed at the Flamingo
Hotel and a friend’s house. Appellant indicated they had been there on vacation. Trooper
Henderson asked if there were any weapons or narcotics in the car. Appellant responded,
“Not that I know of, but it is a rental car, you never know.” Appellant then agreed to permit
Trooper Henderson to search the car. 
          Willis opened the trunk and Trooper Henderson observed laundry detergent was
strewn over the trunk’s floor. The trooper testified that laundry detergent is commonly used
to mask the odor of narcotics. He also observed a high concentration of laundry detergent
in the crease where the back seat met the floor of the trunk. He lifted the back seat and
found two packages of cocaine concealed beneath the seat. He then placed Willis and
Appellant under arrest. 
          Trooper Henderson testified that, after placing Appellant in his patrol car,


 he
advised him of his Miranda rights.


 He further testified that, at that point, Appellant waived
his rights and, in answer to the trooper’s questions, stated the cocaine belonged to both
him and Willis; they paid $8,000 for the drugs and they were trying to make some money
off the drugs. Following Trooper Henderson’s testimony, the trial court denied Appellant’s
motions to suppress.
 

          II.       Motion To Dismiss
          On July 5, 2003, Appellant filed a motion to dismiss the indictment wherein he
alleged the traffic stop was racially motivated. Appellant argued the following evidence
established that Trooper Henderson engaged in “racial profiling”: (1) videotape segments
depicting Trooper Henderson’s other traffic stops the same day he stopped Appellant; (2)
Trooper Henderson’s testimony at the suppression hearing indicating he was traveling at
a high rate of speed in the opposite direction on I-40 when he had “eye contact” with Willis
from across the median; and (3) Trooper Henderson’s initial observation that the two
occupants of the suspect vehicle were black. 
          On the day of trial, March 26, 2007, the trial court again denied Appellant’s motions
to suppress evidence due to illegal arrest, illegal search, and involuntary confession. The
trial court also denied Appellant’s motion to dismiss and ordered the videotape of Trooper
Henderson’s entire shift, Defendant’s Exhibit No. 1, sealed.


 
 

          III.      The Trial
            At trial, the State introduced a second videotape into evidence containing only
Appellant’s traffic stop. Appellant objected because the videotape did not contain the other
traffic stops, contained hearsay statements, and incriminating statements by Appellant
prior to receiving a Miranda warning. Appellant also re-urged the objections raised in his
pre-trial motions. The trial court again overruled Appellant’s objections.
          At trial, Trooper Henderson was qualified as an expert in criminal interdiction. In
addition to reiterating his testimony during the suppression hearing, he testified Interstate
40 was a well-known drug trafficking corridor with drugs running from west to east. He
testified that, when someone immediately exits the interstate after spotting him, it is
generally because they are being evasive or attempting to throw something out of the
vehicle. The State then played the videotape of Appellant’s traffic stop and he commented
on the footage. He testified that, while he was speaking with Willis and Appellant during
the stop, they became increasingly nervous and looked away. When Willis went to the
trunk to look for his driver’s license, the trooper observed and smelled laundry detergent
spread throughout the car’s trunk. He testified laundry detergent is often used to mask the
odor of narcotics from drug-detecting dogs. All this, plus their inconsistent stories
regarding their trip caused him to ask if he could search the car, and Appellant agreed. 
Trooper Henderson then located two packages of cocaine in a storage compartment
underneath the back seat where additional laundry detergent was spread. The cocaine
was wrapped with black electric tape and plastic. 
          After the cocaine was discovered, Appellant was arrested, handcuffed behind his
back, and placed in the backseat of the trooper’s patrol car where he could observe several
deputies searching the vehicle. Shortly thereafter, Trooper Henderson entered the patrol
car and started driving. From the patrol car’s onboard video, the jury learned that, without
giving Appellant any Miranda warnings, as Trooper Henderson turned his vehicle around
in the roadway to proceed to the Shamrock Police Department, he questioned Appellant as
follows: 
HENDERSON:Y’all know what you are under arrest for, right?
APPELLANT:Yes sir.
HENDERSON:Is that cocaine or crack cocaine?
APPELLANT:Cocaine.
HENDERSON:It’s cocaine?
APPELLANT:Yes sir.
 
          At this point, Appellant’s attorney objected:
 
          DEFENSE COUNSEL:      Judge, Objection - - 
          COURT:                            Hang on. Hang on. Hang on. What?
DEFENSE COUNSEL: I’m going to object to those two statements, he has
not been Mirandized and he’s under arrest.
          COURT:                            Overruled. Overruled. I don’t know if he’s been                                                              Mirandized or not.
 
          Shortly thereafter, at the request of a juror who was feeling ill, the court took a short
recess. When the trial court returned from its recess, the following exchange occurred:
COURT:I want to advise the jury that during the break I
was contemplating a ruling that I made
previously. And [defense counsel] had objected
to some of the statements that the defendant
made on the videotape and I overruled this
objection. I decided the better judgment on that
one was to sustain his objection, so you’re
instructed to disregard and not consider for any
purpose, the statement made by the defendant in
the car on the video just before we took a break. 
Okay. 
DEFENSE COUNSEL:Your Honor, move for mistrial. 
          COURT:                            Denied. 
DEFENSE COUNSEL:Your Honor, I’m going to object to any further
statements based on the fact that he did it after
he (was) Mirandized, the prior statements he had
already incriminated himself and this is just
further indication of the fact that he was not – the
statements were not voluntary and he had
already violated the rules, which is not as good as
–
COURT: Well, I don’t – I don’t – my understanding of
Miranda is not that it – is that if you don’t give it
then nothing he ever says is admissible. It’s
anything he says prior to being Mirandized, once
he’s Mirandized would be admissible is my
understanding of the rule.
DEFENSE COUNSEL:Unless in this situation where he’s already
incriminated himself as to the fact that it was
cocaine.
PROSECUTOR: It’s the State’s position that the initial question
asked by Trooper Henderson was simply a
rhetorical question. It was not the result of
custodial interrogation. Anything after Miranda
obviously then is the result of custodial
interrogation.
COURT: Okay. Well, in an abundance of precaution, I’ll go
ahead and rule as I did on the previous
statement, but at this time any statements after
he had been Mirandized would be admissible at
this time, so your objection is overruled.
 
          Picking up again with the trooper’s onboard video, the jury heard:
 
          HENDERSON:                   You have not been advised of your rights so you
don’t have to say no more and I’ll read your rights
here in just a second. You are under arrest for
possession of cocaine. Anything you say can be
used in a court of law; you have a right to stop
answering questions at any time; you have a right
to an attorney; if you can’t afford one, one will be
appointed for you. You understand all these
questions I covered with you today?
APPELLANT:[Short inaudible period followed by Henderson’s
radio conversation describing the search and
seizure of the cocaine]
HENDERSON:How much is it?
APPELLANT:Eighteen ounces.
HENDERSON:Over a pound.
APPELLANT:No sir, not a pound.
HENDERSON:Sixteen ounces is a pound.
APPELLANT:[Inaudible]
HENDERSON:Where did you all pick it up, out there in Phoenix
or where?
APPELLANT:Phoenix.
HENDERSON:[Description over the radio of the traffic stop and
discovery of cocaine.] I got everything good to go
. . . oh, cocaine . . . underneath the back seat
jammed up against the battery . . . underneath
the back seat. 
HENDERSON:How much did you all pay for it?
APPELLANT:Paid about $8,000.
HENDERSON:You got any more money on you?
APPELLANT:No sir.
HENDERSON:Didn’t bring any cash?
APPELLANT:No sir.
HENDERSON:Whose cocaine is it, yours or his?
APPELLANT:I’m gonna say both of ours.
HENDERSON:In on it together?
APPELLANT:[Inaudible response]
HENDERSON:Why did you all go out there to buy it?
APPELLANT:He knows somebody out there, he’s been out
there before. No, I don’t buy it. My friend buy it.
HENDERSON:How much you plan on makin’ off this?
APPELLANT:I don’t know, he said we could make a lot of
money off of it. I ain’t never been in trouble
anywhere.
HENDERSON:Hey you never been arrested before today.
[short inaudible period]
HENDERSON:Oh, you have. Well I appreciate your cooperation
and honesty. That will explain your [inaudible].
HENDERSON:Which one of you all put it under the back seat?
 
          Commenting on the portion of the videotape where he gave Appellant his Miranda
warnings, Trooper Henderson testified that Appellant acknowledged he understood and
waived his rights. Based upon Appellant’s incriminating statements, Trooper Henderson
further testified that, because Appellant and Willis had picked up the cocaine in Phoenix
where Willis had a connection, the trip was premeditated and they were involved in drug
trafficking. He testified that its weight was significant to him “because it was a lot more
[cocaine] than one person could use . . . which led me to believe his story after being
Mirandized that it was going to be sold.” He also testified that cocaine was usually sold by
the gram for $900 and, after the cocaine was cut, Appellant and Willis would double, triple,
or quadruple their money. 
          Brandon Conrad, a chemist with the Texas Department of Public Safety Crime
Laboratory in Amarillo, next testified that the cocaine found in the Pontiac weighed 491.64
grams with a sixty-seven percent purity. Thereafter, the jury returned a verdict of guilty for
possession of cocaine with intent to deliver, and the trial court entered its judgment. 
Discussion
          This appeal principally involves two events: Appellant’s initial traffic stop and his
subsequent admissions under questioning by Trooper Henderson prior to, and after,
receiving Miranda warnings. Initially, Appellant contends the traffic stop was racially
motivated and the result of profiling. As such, he asserts (1) the indictment should be
dismissed; (2) all evidence resulting from the traffic stop should be suppressed because his
arrest was illegal; (3) all evidence from the search of his car should be suppressed because
the search was illegal; and (4) the trial court erred when it failed to admit the entire
videotape of Trooper Henderson’s shift that day. Next, Appellant contends the trial court
erred when it failed to (5) suppress his confession made prior to receiving his Miranda
warnings; and (6) grant his motion for a mistrial due to the erroneous admission of
statements he made after his confession that represented “fruit of the poisonous tree.” 
Finally, Appellant asserts (7) the evidence in support of the verdict is factually insufficient.
          A trial court’s ruling on a motion to suppress is normally reviewed for abuse of
discretion. Balentine v. State, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002). The trial court’s
rulings receive almost total deference on questions of historical fact and the application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. Johnson v.
State, 68 S.W.3d 644, 652-53 (Tex.Crim.App. 2002). That said, we review de novo a trial
court’s ruling on a motion to suppress if that ruling simply involved an application of law to
uncontroverted facts. See Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997);
Hudson v. State, 247 S.W.3d 780, 784 (Tex.App.–Amarillo 2008, no pet.). 
          As to issues five and six, credibility and demeanor were not issues because the facts
regarding the interrogation were preserved on videotape and are completely
uncontroverted. In effect, we are being asked to merely apply the law to uncontroverted
facts to “review the question of the efficacy of the mid-stream Miranda warning de novo.” 
Martinez v. State, 272 S.W.3d 615, 629-30 (Tex.Crim.App. 2008) (Price, J., concurring). 
See State v. Ross, 32 S.W.3d 853, 856 (Tex.Crim.App. 2000); Mayes v. State, 8 S.W.3d
354, 357 (Tex.App.–Amarillo 1999, no pet.). 
 

          I.        Suppression of Evidence – Issues (1), (2), (3) and (4)
                    A.       Racial Profiling – Motion to Dismiss
          Although Appellant’s motion was entitled a “Motion To Dismiss,” its substance was 
directed toward having the trial court find that Appellant’s traffic stop was racially motivated,
suppress all evidence gathered as a result of the illegal stop and dismiss the indictment. 
Appellant argued that, because the stop was racially motivated, Trooper Henderson lacked
reasonable suspicion or probable cause to stop the vehicle and, as a result, all evidence
derived from the traffic stop should be excluded. 
          Peace officers are prohibited from engaging in racial profiling. Tex. Code Crim. Proc.
Ann. art. 2.131 (Vernon 2005).


 Evidence illegally obtained through racial profiling


 may
not be used against a defendant in a criminal trial. Art. 38.23(a). See Pruneda v. State,
104 S.W.3d 302, 305 (Tex.App.–Texarkana 2003, pet. ref’d). When a defendant asserts
his arrest was based solely on racial profiling without probable cause or reasonable
suspicion, the proper avenue for relief is a suppression motion. Ex parte Brooks, 97
S.W.3d 639, 640 (Tex.App.–Waco 2002, no pet.).


 As a result, we find that, although
Appellant’s motion was entitled a “Motion to Dismiss,” it is in substance a motion to
suppress evidence due to racial profiling. See Wade v. State, 814 S.W.2d 763, 764-65
(Tex.App.–Waco 1991, no pet.) (substance of a motion is not determined by its title). 
                     B.       Search and Arrest 
          It is generally accepted that law enforcement officers may lawfully stop a motorist
who commits a traffic violation. McVickers v. State, 874 S.W.2d 662, 664 (Tex.Crim.App.
1993), superseded by statute on other grounds as stated in Granados v. State, 85 S.W.3d
217, 227-30 (Tex.Crim.App. 2002); Garcia v. State, 827 S.W.2d 937, 944 (Tex.Crim.App.
1992). Here, Trooper Henderson testified that he stopped Appellant’s car for failing to
signal two lane changes; Tex. Transp. Code Ann. § 545.104 (Vernon 1999), and running
a stop sign. Id. at § 545.010. His testimony regarding these traffic violations was
uncontroverted. Thus, the trial court did not abuse its discretion in finding Trooper
Henderson’s traffic stop properly met state and federal constitutional requirements.
          Furthermore, once the purpose of a traffic stop has been effectuated, it is not
improper for an officer to ask the driver if he possesses any illegal contraband and then
solicit his voluntary consent to search the vehicle. Strauss v. State, 121 S.W.3d 486, 491
(Tex.App.–Amarillo 2003, pet. ref’d). Trooper Henderson’s testimony that he requested to
search Appellant’s rental car and Appellant voluntarily consented is also uncontroverted. 
As a result of the search, Trooper Henderson discovered two packages of cocaine hidden
beneath the rear seat of the car and arrested Appellant. Accordingly, the trial court did not
abuse its discretion in finding Trooper Henderson’s search of Appellant’s car and
Appellant’s subsequent arrest were proper.
                     C.       Racial Profiling – Exclusion of “Sealed” Videotape
          Examination of an officer’s subjective motive for a traffic stop is not a part of the
court’s evaluation of the reasonableness of a detention under search and seizure law. See
Crittenden v. State, 899 S.W.2d 668, 674 (Tex.Crim.App. 1995) (traffic stop for failing to
signal a lane change); Garcia v. State, 827 S.W.2d 937, 944 (Tex.Crim.App. 1992) (traffic
stop for running a stop sign); Russell v. State, 904 S.W.2d 191, 198-99 (Tex.App.–Amarillo
1995, pet. ref’d) (traffic stop for defective brake light). Where, as here, the trooper’s stop
and detention was reasonable, the subsequent search of the vehicle was consensual and
the arrest was supported by probable cause, the trooper’s motives, licit or illicit, are
irrelevant because “the exclusionary rule has no application and the intent with which [police
officers] acted is of no consequence.” Garcia, 827 S.W.2d at 943 (quoting United States
v. Causey, 834 F.2d 1179, 1185 (5th Cir. 1987) (en banc)); State v. West, 20 S.W.3d 867,
872 (Tex.App.–Dallas 2000, pet. ref’d). “As long as the facts and circumstances show a
valid and legal detention, it serves no actual Fourth Amendment function to attempt to
unearth the subjective reasons for such detention.” Garcia, 827 S.W.2d at 944. 
          Here, the uncontroverted evidence shows that, after noticing Trooper Henderson,
Willis immediately changed lanes without signaling, exited the interstate, and subsequently
ran a stop sign. Accordingly, the trial court did not abuse its discretion by denying
Appellant’s motion to suppress evidence due to racial profiling or excluding the videotape
segments of unrelated traffic stops. We overrule issues one through four.
          II.       Mid-Stream Miranda Warnings - Issues (5) and (6)
          Appellant contends the trial court erred when it failed to (5) suppress his confession
made prior to receiving his Miranda warnings; and (6) grant his motion for a mistrial due to
the erroneous admission of statements he made after his confession that represented “fruit
of the poisonous tree.” We need not review Appellant’s fifth issue because it is moot.


 
          Further, because the “fruit of the poisonous tree doctrine” does not apply to violations
of the prophylactic requirements in Miranda; Montemayor v. State, 55 S.W.3d 78, 90
(Tex.App.–Austin 2001, no pet.) (quoting Baker v. State, 956 S.W.2d 19, 22 (Tex.Crim.App.
1997)), we review Appellant’s sixth issue to determine whether his privilege against
compulsory self-incrimination has been violated.


 In that context, Appellant asserts that he
was interrogated in “two stages” with the second stage being a “mere continuation” of the
first interrogation, causing the Miranda warnings administered mid-stream to be
meaningless under Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643
(2004) and Jones v. State, 119 S.W.3d 766 (Tex.Crim.App. 2003). The State contends
Appellant’s warned statements were admissible under Oregon v. Elstad, 470 U.S. 298, 105
S.Ct. 1285, 84 L.Ed.2d 222 (1985), because Trooper Henderson’s subsequent
administration of Miranda warnings sufficed to remove the conditions that precluded
admission of Appellant’s unwarned statements.
Elstad
          In Elstad, the police went to the home of a juvenile suspect to take him into custody
on a charge of burglary. While effectuating the arrest pursuant to a warrant, one of the
officers stopped in the living room and spoke with the suspect’s mother. In the course of
that conversation, the officer asked the suspect if he was aware of why the officers were
there to talk to him. After the suspect responded in the negative, one of the officers stated 
that he “felt” he was involved in a neighborhood burglary. In response to that statement,
prior to being given any Miranda warnings, the suspect acknowledged that he had in fact
been at the scene of the crime. Later, after having received his Miranda warnings, the
suspect gave a more detailed account of his involvement in the crime. The juvenile suspect
later argued that the second statement should be suppressed because it stemmed from the
unwarned first statement. In holding the second statement admissible and voluntary, the
Elstad Court determined that the officer’s inadvertent failure to administer the warnings prior
to obtaining an incriminating statement, unaccompanied by any actual coercion or other
circumstances calculated to undermine the suspect’s ability to exercise his free will, was not
such conduct as would render the subsequent statement involuntary. Elstad, 470 U.S. at
318, n.5.
Seibert
          The limits of Elstad and the two-step process of obtaining an incriminating statement
prior to being given Miranda warnings, and then obtaining a second incriminating statement
after being Mirandized, were further examined by the Supreme Court in Seibert. During a
custodial interrogation, without being given any Miranda warnings, after being questioned
for approximately thirty to forty minutes, Patricia Seibert gave a confession concerning a
homicide. After a twenty minute break, she was given Miranda warnings which she waived. 
After waiving her rights, the questioning officer confronted her with her pre-warning
statements and obtained a second confession. Seibert, 542 U.S. at 605-06. In a plurality
opinion,


 the Supreme Court determined that a deliberate strategy of withholding Miranda
warnings until after first questioning and obtaining a confession could render a postwarning
confession inadmissible in those circumstances where the subsequent warning failed to
function “effectively” as Miranda required. Id. at 617.

Jones
          Approximately eight months before Seibert, the Court of Criminal Appeals reached
a similar result in Jones v. State, 119 S.W.3d 766 (Tex.Crim.App. 2003). Jones, a suspect,
was questioned twice about a murder while in custody. Id. at 771. Each time he received
Miranda warnings prior to questioning and, after waiving his Miranda rights during the
second interview, gave a written statement indicating he had committed the murder being
investigated. Id. More than a week later, without being administered any Miranda warnings,
Jones was interviewed by law enforcement officers about two other murders. Jones
confessed and described his involvement in the two murders. As he did so, the
investigating officer wrote down Jones’s confession, asked questions, and eventually
transcribed the statement. Id. at 772. When Jones had finished his account, the officer
went over Jones’s legal rights appearing at the top of the written form, read the statement
with Jones, corrected any mistakes, had Jones initial any revisions, and eventually sign the
statement at the bottom. Id. 
          On appeal, Jones argued that the officer’s failure to inform him of his rights at the
outset of the interrogation violated his right against self-incrimination under Miranda. Id. at
772. The State argued that, even though Jones was not warned until after he made his oral
statement, his receipt of the required warnings before signing the statement rendered it
voluntary and admissible under Elstad. Id. After examining the surrounding circumstances
and the entire course of police conduct with respect to Jones in evaluating the voluntariness
of his written statement, the Court of Criminal Appeals could not place the subsequent
statement in the same category as the written statement at issue in Elstad because the
unwarned statement in Elstad was elicited almost inadvertently during a brief encounter with
the suspect’s mother in the living room, and it was apparent that the officer’s purpose was
not to interrogate the suspect, but to notify the suspect’s mother of the reason for his arrest. 
Id. at 773-74. Further distinguishing Elstad, the Jones Court stated as follows: 
By contrast, the circumstances in the instant case reflect, at the very least, a
serious misunderstanding by law enforcement, not about whether appellant
was in custody, but of the dictates of Miranda. Further, in contrast to Elstad
where the initial unwarned statement took place at the defendant’s home and
the warned statement was given after transporting the defendant to the police
station, the unwarned and warned statements in this case were given during
a nearly undifferentiated single event, taking place in the same room as an
uninterrupted and continuous process.
    
Id. at 775-76 (emphasis added).
          Since the parties originally briefed and argued this appeal, the Court of Criminal
Appeals has had occasion to issue an opinion addressing the Elstad - Seibert dichotomy
of cases, thereby clarifying the circumstances under which Seibert applies when appellate
courts are asked to determine the efficacy of mid-stream Miranda warnings. See Martinez
v. State, 272 S.W.3d 615, 619-621 (Tex.Crim.App. 2008).




Martinez
          Martinez was arrested by Officer Sosa in connection with a robbery and murder but
did not receive any Miranda warnings. At the police station, Officers Sosa and Hernandez
questioned Martinez about the crime. Shortly thereafter, Sosa and Hernandez took
Martinez to a police polygrapher where he underwent a three to four hour test. Afterwards,
Sosa and Hernandez resumed interrogation of Martinez. After telling Martinez that he failed
the polygraph test, Sosa and Hernandez took Martinez to a municipal court where a
magistrate informed him of his Miranda rights and other statutory warnings. Upon
Martinez’s prompt return to the central holding station, Sosa and Hernandez again
questioned Martinez about the robbery and murder. Sosa repeated the Miranda warnings,
and Martinez gave a videotaped statement incriminating himself. Id. at 618.
          The majority’s opinion 


 first determined that Sosa and Hernandez engaged in a two-step interrogation of Martinez calculated to undermine the subsequent Miranda warnings
given by the Magistrate, and later at the station house by Sosa prior to the videotaped
statement. 272 S.W.3d at 622-23. Their finding was premised upon the failure to warn
Martinez at the time of his arrest–prior to subsequent questioning at the station house and
the polygraph examination. Because the Magistrate’s reading of the Miranda warnings
came after Martinez’s arrest, his first round of interrogation and the polygraph examination,
the Martinez Court concluded Sosa and Hernandez engaged in a two-step interrogation, as
follows: 
Here, appellant was in custody for the purposes of Miranda; he gave both
statements to law enforcement officials after his formal arrest pursuant to an
arrest warrant, and both statements were given at the police station. This
indicates that the absence of Miranda warnings at the beginning of the
interrogation process was not a mistake based on the interrogating officer’s
mistaken belief that appellant was not in custody, but rather a conscious
choice.
 
Id. at 624.
          In Martinez, the Court recognized several relevant factors bearing on the
determination of whether it would be reasonable to find that Miranda warnings delivered
midstream in the interrogation process could “effectively” function as required. Those
factors include: (1) the completeness and detail of the questions and answers in the first
round of interrogation, (2) the over-lapping content of the two statements, (3) the timing and
setting of the first and second statements, (4) the continuity of law enforcement personnel,
and (5) the degree to which the interrogator’s questions treated the second round as a
continuation of the first round. See id. at 620. See also Seibert, 542 U.S. at 601-02. 
          Because the same officers conducted both interrogation sessions and Martinez was
in the presence of police personnel the entire day of his arrest, the majority rejected the
State’s assertion that there was a substantial break between the prewarning and
postwarning interrogations. 272 S.W.3d at 624-25. The Martinez Court determined that,
although Martinez was read his Miranda warnings by the Magistrate and later at the station
house before the videotaped statement, the warnings were ineffective because “[b]oth
officers . . . failed to inform [Martinez] that, based on the lack of Miranda warnings, any prior
statement made during the previous interrogation, including the polygraph exam, could not
be used against him.” Id. at 626. The Martinez Court further stated:
[T]he officers had the responsibility to inform [Martinez] that the questions
asked during the polygraph test, or the test results, could not be used at trial
and that any mention of the test at trial was likewise prohibited. This, coupled
with the fact that the officers initiated the conversation regarding the first
interrogation, likely created the belief in [Martinez’s] mind that he was
compelled again to discuss the matters raised in the first interview during the
second interview.
 
Id. at 626.



 
          The Martinez Court then determined that, where a deliberate, two-step strategy has
been used, “postwarning statements related to the substance of prewarning statements
must be excluded unless curative measures are taken before the postwarning statement
is made.” Id. at 626-67. Because the officers did not apprise Martinez of his Miranda rights
when they began the first custodial interrogation and failed to apply any curative measures
in order to ameliorate the harm caused by the Miranda violation, the Martinez Court held
that the subsequent videotaped statement was inadmissible. 272 S.W.3d at 627.


 
Analysis 
          Like the defendant in Martinez, Appellant was also subjected to a conscious, two-step interrogation without any curative measures being applied. Trooper Henderson was
a highly experienced officer and an expert in criminal interdiction.


 Within nine minutes of
Appellant’s arrest for possession of a controlled substance, being handcuffed behind his
back, and placed in the backseat of the patrol car, Trooper Henderson began interrogating
Appellant without giving him his Miranda warnings. Within three short questions spanning
approximately seventeen seconds, Trooper Henderson had the equivalent of a confession. 
In fact, he asked the same incriminating question twice knowing the answers were being
recorded. Immediately after Appellant confessed, Trooper Henderson gave Appellant his
Miranda warnings, and then, immediately resumed his interrogation related to the cocaine
found in the car. Given Trooper Henderson’s experience and expertise, we find that the
absence of Miranda warnings at the beginning of Appellant’s interrogation process was not
based upon the trooper’s mistaken belief that Appellant was somehow not entitled to a
Miranda warning. Nor do we believe that his initial interrogation was a casual, rhetorical
conversation. Someone of Trooper Henderson’s experience certainly did not need
Appellant to assist him in differentiating cocaine from crack cocaine. Based upon the facts
of this case, we have concluded that Trooper Henderson’s two-step approach was a
conscious choice, calculated to undermine Appellant’s Miranda rights.
          Neither did Trooper Henderson administer any curative measures after his custodial
interrogation yielded Appellant’s unwarned confession. Rather, Trooper Henderson’s pre-warning questions, though brief, yielded an incriminating statement and subsequent
questioning, though simple, direct, and covering a short period of time, repeated the same
confession. The content of the two statements was overlapping. The before-warning and
after-warning statements both concerned Appellant’s knowledge of and connection to the
controlled substance found in the car. All Appellant’s statements were made in the patrol
car to the same officer within seconds of each other. Temporally and substantively, Trooper
Henderson’s questioning constituted a single, uninterrupted interrogation. Moreover,
Trooper Henderson made no attempt to tailor the Miranda warning he eventually gave to
the particular situation and did not convey any distinction whatsoever between the
statements that might come after the warning and those that came before.



           The instant case is a far cry from Elstad where the initial conversation took place in
the suspect’s living room with his mother nearby. Elstad, 470 U.S. at 305-06, 311-12. 
Rather, this case is more like Seibert where the defendant was under arrest and in custody
but had not received any Miranda warnings. Seibert, 542 U.S. at 604-05. 
          Here, the circumstances reflect not only a serious misunderstanding regarding
whether Appellant’s unwarned statements were the result of custodial interrogation, but also
of the dictates of Miranda. At the suppression hearing, Trooper Henderson testified that he
had given Appellant his Miranda warnings after he was arrested but prior to any custodial
interrogation. Like the investigating officer in Jones, Trooper Henderson ostensibly believed
Miranda warnings were unnecessary when he asked Appellant to identify the substance
found. Further, when confronted with the videotape at trial showing Trooper Henderson’s
interrogation of Appellant actually began prior to the required warnings, the State argued
that Appellant was not the subject of a custodial interrogation and Trooper Henderson’s
questions were merely “rhetorical,” i.e., unintended to elicit a response from Appellant. On
appeal, however, the State now admits that, because Appellant was under arrest when he
made the unwarned admissions, those statements were inadmissible at trial.
          Further, the circumstances attendant to Appellant’s unwarned and warned
interrogation were more coercive than the circumstances of the defendant’s interrogations
in either Seibert or Jones. Here, there was little, or no, time buffer between Appellant’s
arrest and Trooper Henderson’s interrogation. Unlike either Seibert or Jones, Appellant had
not been transported to a police station and placed in an interrogation room before being
questioned. Rather, Appellant was sitting in the backseat of a police car, with his hands
handcuffed behind his back, at the crime scene, looking out through a metal grill where a
number of law enforcement officers were searching his vehicle. Moreover, Trooper
Henderson’s subsequent warned interrogation was punctuated by radio descriptions of the
car’s search, the seizure of the cocaine, and Appellant’s arrest. At one point, after
Appellant had already made incriminating statements, Trooper Henderson radioed in a
more detailed description of the location where the cocaine was found in the car and then
immediately resumed his interrogation.


 
          The State places a great deal of reliance upon two cases, United States v.
Carrizales-Toldedo, 454 F.3d 1142 (10th Cir. 2006) and United States v. Yamba, 407
F.Supp. 703 (W.D. Pa. 2006), for support of its position that reflexive questions, not
intended as interrogation, did not render subsequent incriminating statements inadmissible. 
These cases either support our decision or are inapposite.     In both cases, the unwarned
statements were in response to an officer’s open-ended questions such as “What are you
doing?” and “What are these?” that were contemporaneous with the discovery of the
contraband in Carrizales-Toledo; 454 F.3d at 1152, and stolen credit card numbers in
Yamba, 407 F.Supp.3d at 718-19. Trooper Henderson’s questions were neither open-ended nor contemporaneous with the discovery of the contraband. Rather, his questions
were pointed, direct, and asked after he had sufficient time to assess the situation and plan
his interrogation strategy. Further, in Carrizales-Toledo, it was unclear whether the suspect
was in custody when first statements were made. The Tenth Circuit ultimately determined
that the suspect’s initial statements were voluntary and his subsequent statements were
made after being properly Mirandized; 454 F.3d at 1153. Furthermore, the court in Yamba 
ultimately determined that the officer’s spontaneous query was inadvertent and the
suspect’s response was innocuous. 407 F.Supp.2d at 718. 
          Here, as in Seibert and Jones, Appellant’s unwarned and warned statements were
made while he was in custody during an undifferentiated single event, taking place in
Trooper Henderson’s patrol car as an uninterrupted and continuous interrogation process. 
At no time were any curative measures taken to ameliorate the harm caused by the Miranda
violation. Under the circumstances presented here, considering all of the relevant factors,
it is clear that the Miranda warnings could not have functioned effectively. The two-step
interrogation technique had the likely effect of undermining both Appellant’s ability to assert
his right to remain silent and his ability to knowingly, voluntarily, or intelligently waive that
right. Accordingly, all post-warning statements made by Appellant to the trooper should
have been suppressed in the State’s case-in-chief.
Harm Analysis 
          Having found that the trial court erred in admitting Appellant’s warned statements,
we must conduct a harm analysis to determine whether the error calls for reversal of the
judgment. Tex. R. App. P. 44.2. Because a correct ruling in this instant is constitutionally
required under Miranda; see Dickerson v. United States, 530 U.S. 428, 439-40, 120 S.Ct.
2326, 147 L.Ed.2d 405 (2000), the error is constitutional error; see Alford v. State, 22
S.W.3d 669, 673 (Tex.App.–Fort Worth 2000, pet. ref’d), and Rule 44.2(a) is applicable. 
Thus, we evaluate the entire record in a neutral, impartial, and even-handed manner, not
in the light most favorable to the prosecution; id. at 586; Kane v. State, 173 S.W.3d 589,
594 (Tex.App.–Fort Worth 2005, no pet.), and must reverse unless we determine beyond
a reasonable doubt that error did not contribute to Appellant’s conviction or punishment. 
Alford, 22 S.W.3d at 673. We consider the source and nature of the error, the extent it was
emphasized by the State, its probable collateral implications, the weight a juror would
probably place on the error, and whether declaring it harmless would be likely to encourage
the State to repeat it with impunity. Harris v. State, 790 S.W.2d 568, 587 (Tex.Crim.App.
1989). We do not focus on the propriety of the outcome, but calculate as much as possible
the probable impact on the jury in light of the existence of other evidence. Wesbrook v.
State, 29 S.W.3d 103, 119 (Tex.Crim.App. 2000), cert. denied, 532 U.S. 944, 121 S.Ct.
1407, 149 L.Ed.2d 349 (2001). 
          In a possession with intent to deliver case, the State must prove that the defendant:
(1) exercised care, custody, control, or management over the controlled substance, (2)
intended to deliver the controlled substance to another, and (3) knew that the substance in
his possession was a controlled substance. See Tex. Health & Safety Code Ann. §§
481.002(38) (Vernon 2003 & Supp. 2008), 481.112(a) (Vernon 2003); Nhem v. State, 129
S.W.3d 696, 699 (Tex.App.–Houston [1st Dist.] 2004, no pet.). 
          When, as here, the accused is not in exclusive possession of the place where the
contraband is found, there must be additional, independent facts that link him to the
contraband in such a way that it can be concluded that the accused had knowledge of the
contraband and exercised control over it. See Guiton v. State, 742 S.W.2d 5, 8
(Tex.Crim.App. 1987) (heroin concealed inside chair cushion in rented room); Presswood
v. State, 548 S.W.2d 398, 399-400 (Tex.Crim.App. 1977) (marihuana concealed in glove
compartment of a borrowed car). 
          Intent to deliver may also be proven by circumstantial evidence. See Garrett v.
State, 161 S.W.3d 664, 671 (Tex.App.–Fort Worth 2005, pet. ref’d). Courts have
considered several factors in determining intent, including (1) the nature of the location
where the accused was arrested (known drug-dealing or high crime area), (2) the quantity
of contraband in the accused’s possession (between 1,000 and 3,013 grams of cocaine),



(3) the manner of the packaging (individual packets or units for resale), (4) the presence or
absence of drug paraphernalia (for use or sale), (5) whether the defendant possessed a
large amount of cash in addition to the drugs (typically in denominations indicative of
multiple drug sales), and (6) the defendant’s status as a drug user. See Jordan v. State,
139 S.W.3d 723, 726 (Tex.App.–Fort Worth 2004, no pet.). Expert testimony by
experienced law enforcement officers may also be used to establish an accused’s intent to
deliver. See Morrow, 757 S.W.2d at 488. 
          The record before us is clear that reversal is warranted. Appellant’s confession was
the very cornerstone of the State’s case. In its opening statement, the State connected
Appellant with the cocaine found in the car through his “voluntary acknowledge[ment] that
he was, in fact, in possession of the cocaine,” and promised to establish its case through
Appellant’s statements telling Trooper Henderson “where he was, where he went to get [the
cocaine] and where they were headed.” The State’s entire case rested on Trooper
Henderson’s testimony,


 the onboard videotape of the traffic stop, and Appellant’s
responses to Trooper Henderson’s interrogation. The State played Appellant’s videotaped
responses to Trooper Henderson’s questions and argued that they amounted to a complete
confession of every element of the crime being tried. In fact, there is no question that
Appellant’s responses to Trooper Henderson’s questions are thoroughly incriminating. 
          A confession such as Appellant’s is “generally likely to have a profound impact on
a jury, especially at the guilt stage of a trial.” Jones, 119 S.W.3d at 783 (citing McCarthy
v. State, 65 S.W.3d 47, 56 (Tex.Crim.App. 2001), cert. denied, 536 U.S. 972, 122 S.Ct.
2693, 153 L.Ed.2d 862 (2002). See Arizona v. Fulminante, 499 U.S. 279, 292, 111 S.Ct.
1246, 113 L.Ed.2d 302 (1991) (“a defendant’s confession is probably the most probative
and damaging evidence that can be admitted against him”). This is particularly so here
where there is virtually no other testimony or physical evidence linking Appellant to the
contraband or establishing that he intended to deliver the contraband to someone else.


 
          Although the State correctly cites Rule 44.2 of the Texas Rules of Appellate
Procedure for the applicable standard of review, the State asserts only that sufficient
evidence of Appellant’s possession of cocaine was adduced from which the jury could have
concluded that Appellant was in possession of a controlled substance. The State does not
address the “intent to deliver” element. In support of its assertion that any error was
harmless, the State relies upon Akins v. State, 202 S.W.3d 879, 890-91 (Tex.App.–Fort
Worth 2006, pet. ref’d.). Although the defendant in Akins was charged with possession with
intent to deliver, the improperly admitted evidence went only to the issue of Akin’s
possession of a controlled substance. See id. at 891-92. The State argues that the
following evidence of possession presented at trial is sufficient to render any error harmless:
(1) Appellant rented the car in which the cocaine was found; (2) he and the driver were
traveling a well-known drug corridor; (3) both men were nervous during the stop; (4) their
stories were inconsistent; (5) Appellant’s luggage was in the trunk where laundry detergent
had been spread; and (6) there was a large amount of cocaine found under the backseat. 
While these facts may arguably be sufficient to link Appellant to the controlled substance,
there is little, if any, meat on these bones inso far as the “intent to deliver” element. See
supra, n.19. The jury almost certainly relied on Appellant’s confession to convict. 
           The question, here, is not whether sufficient evidence to convict existed without the
confessions, “but whether there is a reasonable possibility that the erroneously admitted
evidence contributed to the verdict obtained.” Jones v. State, 883 S.W.2d 118, 127
(Tex.Crim.App. 1992), cert. denied, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993). 
Having reviewed the entire record, we cannot say beyond a reasonable doubt that the error
made no contribution to Appellant’s conviction. Accordingly, although Appellant’s fifth issue
is moot, his sixth issue is sustained. Appellant’s remaining issue is pretermitted.
Conclusion
          We reverse the trial court’s judgment and remand for further proceedings consistent
with this opinion. 
 
                                                                                      Patrick A. Pirtle 

                                                                                             Justice

Publish.